IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 123,280

In the Matter of DONNA L. HUFFMAN,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed May 27, 2022. Two-year suspension with possibility of probation after 90 days upon approval of a practice supervision plan.

*Deborah L. Hughes*, Deputy Disciplinary Administrator, argued the cause, and *Gayle B. Larkin*, Disciplinary Administrator, was with her on the brief for petitioner.

*Donna L. Huffman*, respondent, argued the cause and was on the briefs pro se.

PER CURIAM:  This is a contested attorney discipline proceeding against Donna L. Huffman, of Oskaloosa, who was admitted in 2010 to practice law in Kansas. After a five-day hearing, a panel of the Kansas Board for Discipline of Attorneys unanimously concluded Huffman violated the Kansas Rules of Professional Conduct while representing homeowners in multiple lawsuits over the mortgage on their residence. The panel determined her litigation tactics included filing multiple lawsuits containing frivolous claims, making what was characterized as "extensive and needless" discovery requests, and serially relitigating settled issues. A federal district court at one point imposed a $5,000 sanction against her. Ultimately, the homeowners were assessed nearly $290,000 in their lender's legal fees, which exceeded the mortgage principal. The lender's attorneys billed over $700,000 for their work.

1

The panel unanimously found Huffman violated KRPC 1.1 (competence) (2022 Kan. S. Ct. R. at 327); KRPC 3.1 (meritorious claims) (2022 Kan. S. Ct. R. at 390); KRPC 3.5 (impartiality and decorum of the tribunal) (2022 Kan. S. Ct. R. at 396); KRPC 8.2 (judicial and legal officials) (Kan. S. Ct. R. at 432); and KRPC 8.4 (misconduct) (2022 Kan. S. Ct. R. at 434). A majority of the panel recommends published censure, while a dissenting panel member recommends a 90-day suspension. The Office of the Disciplinary Administrator recommends indefinite suspension. Huffman challenges some factual findings and conclusions of law and recommends a private admonition.

We hold clear and convincing evidence establishes attorney misconduct as to KRPC 1.1 (competence), KRPC 3.1 (meritorious claims), and KRPC 8.4 (misconduct). A majority of the court rejects the panel's findings and conclusions as to KRPC 3.5 (impartiality and decorum of the tribunal) and KRPC 8.2 (judicial and legal officials) as being unsupported by clear and convincing evidence. A minority of the court would have found these additional violations.

Based on the violations found, we suspend Huffman from practicing law in this state for a period of two years, while granting her the possibility for probation after 90 days upon approval by the Disciplinary Administrator's office of a practice supervision plan for the remaining suspension period, all to be followed by a reinstatement hearing once she completes the two-year term. If a disagreement arises between Huffman and the Disciplinary Administrator's office over the practice supervision plan, either or both may file a motion with this court to resolve that dispute about the plan or compliance with its terms.

PROCEDURAL BACKGROUND

The Disciplinary Administrator filed a formal complaint on January 10, 2019, and an amended complaint on September 4, 2019, alleging various KRPC violations against Huffman. She filed an answer on February 19, 2019. The panel conducted hearings on November 6-8 and December 19-20, 2019. She appeared pro se. The panel issued a 71-page final hearing report. It provides in relevant part:

*"Findings of Fact*

"Background Facts

"46.     The hearing panel finds the following facts, by clear and convincing evidence:

"47.     In 2008, R.B. obtained a variable rate loan in the amount of $184,222.00 from Security National Mortgage Company to purchase a home and signed a promissory note to that effect. R.B. is listed as the only borrower and only he signed the note. However, the note was secured by a mortgage signed by both R.B. and his wife, S.B. Wells Fargo serviced the loan and eventually came to own the promissory note. R.B. and S.B. made regular monthly payments.

"48.     In May, 2009, R.B. applied with Wells Fargo to refinance the house. According to a computerized system of recording communications, employees of Wells Fargo made contact with R.B. as follows:

         a.      On May 15, 2009, C.M. completed the welcome call
         with R.B.

3

b. On May 17, 2009, the loan terms were changed to accommodate R.B.'s request, June 24, 2009, was listed as the anticipated closing date, and Wells Fargo approved R.B.'s credit.

c. On May 20, 2009, C.M. left a message for R.B. to return the call to 'go over loan' information.

d. On May 21, 2009, C.M. went over loan information with R.B. C.M. faxed documents to him so the documents could be returned quickly.

e. On May 28, 2009, the loan terms were changed to accommodate R.B.'s request. The anticipated closing date remained June 24, 2009. Also on May 28, 2009, C.M. requested additional documentation from R.B.

f. On June 4, 2009, C.M. called R.B. regarding the additional documentation. On June 10, 2009, C.M. left a message for R.B. confirming receipt of the additional requested documentation. On June 18, 2009, the loan terms were changed to accommodate R.B.'s request and the anticipated closing date remained listed as June 24, 2009.

g. On June 18, 2009, R.B. called Wells Fargo and left a message for C.M. R.B. was frustrated. J.D. told R.B. that the loan should be 'final approved' in time to close the following week. R.B. indicated that he is a truck driver, he would be home Wednesday, June 24, and he could sign either Wednesday, June 24 or Thursday, June 25.

h. On June 19, 2009, C.M. called R.B. and left a message for him, confirming that she received his message. C.M. confirmed that she would call R.B. to schedule closing when the file was back. The loan terms were changed to accommodate R.B.'s request and the anticipated closing date remained listed as June 24, 2009.

i. On June 22, 2009, C.M. called R.B. and left a message that she needed R.B.'s W-2 and she would resubmit the file to get a 'clear to close.' On June 24, 2009, C.M. forwarded the file to get a 'clear to close.' On June 24, 2009, S.H. received a complete decision and the transaction was approved. That same day, C.M. entered a closing hand-off date.

j. On June 25, 2009, C.M. printed the note and the mortgage/deed. Additionally, C.M. twice sent the closing package to the settlement agent and twice the settlement agent downloaded the closing package.

"49. R.B. did not sign the closing documents. The record does not establish why R.B. did not sign the closing documents or whether R.B. was provided with a specific time and location of closing.

"50. Even though the closing did not occur, the closing agent, Transcontinental Title Company, mistakenly informed Wells Fargo that the closing occurred.

"51. Wells Fargo executed a Certificate of Satisfaction on July 3, 2009, which provided that R.B. and S.B.'s 2008 mortgage had been released. Wells Fargo filed the Certificate of Satisfaction concerning the 2008 Mortgage with the Shawnee County Register of Deeds. Wells Fargo sent a letter of congratulations to R.B. and S.B. on July 6, 2009, informing them of the loan payoff.

"52. On July 13, 2009, C.M. noted that R.B. did not sign the closing documents, but that the loan had been funded by Wells Fargo as authorized by M.M. on June 30, 2009. C.M. also noted that she had been trying to contact R.B. to find out what happened. C.M. did not make any additional notes about contact with R.B.

"53.     Over the course of four months, Wells Fargo sent R.B. statements with the lower monthly payment amount that would have been due had the closing actually occurred.

"54.     On October 27, 2009, Wells Fargo marked the refinance loan for deletion because closing never occurred.

"55.     On October 29, 2009, C.Y. of Wells Fargo wrote to R.B. and explained that the 2008 mortgage was paid off in error. C.Y. also informed R.B. that Wells Fargo would continue to hold its lien against the property and that payment would continue to be due under the 2008 mortgage.

"56.     On November 13, 2009, Mortgage Electronic Registration Systems ('MERS') executed a 'Caveat as to [the] Existence of a Mortgage Lien Due to Erroneous Release of Mortgage' ('Caveat'). This document, signed by L.S., essentially stated that the Certificate of Satisfaction had been executed in error and that R.B. and S.B. were still required to pay the 2008 mortgage as their debt was never fully paid. L.S. filed the Caveat with the Shawnee County Register of Deeds on November 20, 2010.

"57.     R.B. and S.B. continued to make the lower monthly payments that would have been due had the closing taken place.

"Case No. 10-CV-4141

"58.     On October 22, 2010, R.B. and S.B. sued MERS and L.S. for slander and disparagement of title, conversion, negligence, fraud and/or misrepresentation, and violations of the Kansas Consumer Protection Act ('KCPA') in Shawnee County District Court case number 10-C-1517. On November 16, 2010, the defendants removed the case to the United States District Court for the District of Kansas case number 10-CV-4141.

"59.     Wells Fargo declared the 2008 loan to be in default and on December 20, 2010, commenced foreclosure proceedings in Shawnee County District Court case

6

number 10-C-1808. On January 6, 2011, Wells Fargo dismissed the foreclosure action because of the pending federal litigation.

"60.    On April 15, 2011, Wells Fargo moved to intervene in the federal suit. On August 3, 2011, the magistrate judge granted Wells Fargo's motion to intervene over the respondent's objection. On August 4, 2011, Wells Fargo filed its answer to the petition and counterclaims against R.B. and S.B. for a declaratory judgment regarding the Certificate and Caveat, equitable reinstatement of the 2008 mortgage, and foreclosure on the 2008 mortgage.

"61.    On December 30, 2011, the respondent filed a motion on behalf of R.B. and S.B. essentially requesting the court to reconsider the order allowing Wells Fargo to intervene. The district court denied the motion as untimely and because the issues raised were previously raised before the magistrate and properly rejected.

"62.    On December 30, 2011, the respondent also filed a motion on behalf of R.B. and S.B. to remand the case back to state court, arguing that the federal court lacked jurisdiction to hear claims involving MERS. On January 6, 2012, the respondent filed a motion on behalf of R.B. and S.B. to dismiss Wells Fargo's counterclaims.

"63.    The court denied the motion to remand and the motion to dismiss the counterclaims and cautioned the respondent against relitigating issues already resolved:

    'The court will deny the Motion to Dismiss. Discovery in the action has not been completed, and the defendant is entitled to a full and fair opportunity to obtain evidence to support its claims. The Magistrate Judge determined in his Order permitting intervention that, while [R.B. and S.B.] may contend that Wells Fargo's interest is "speculative or non-existent," the defendant "ought to be allowed to show otherwise" at trial. Wells Fargo's counterclaims—which seek declaratory judgment, equitable reinstatement, and foreclosure—all satisfy the requirements of

7

Fed. R. Civ. Pr. 8 of "a short and plain statement of the claim showing that the pleader is entitled to relief," and all of the claims advanced by Wells Fargo demonstrate a plausible and reasonable basis for potential relief.

'The court further finds that the plaintiffs' Motion to Remand, filed four months after the Order allowing intervention, should also be denied. First, it is again an attempt by the plaintiffs to circumvent Rule 7.3's fourteen-day timing requirement for motions for reconsideration. Accordingly, the motion is denied for the same reasons as stated in the court's denial of the previous "Motion . . . For Review."

'Further, the substance of the plaintiffs' jurisdictional challenges have been previously and properly rejected by Judge Waxse. The court has original jurisdiction to hear the action, as complete diversity exists among all the parties. Accordingly the plaintiffs' arguments relating to supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), are irrelevant. The plaintiffs have failed to articulate any potential claims which could divest the court of jurisdiction. The requisite amount in controversy is satisfied by the plaintiff's own claims alleging that the value of their house exceeded $75,000, as well as their explicit assertions during discovery that they seek compensatory and punitive damages far in excess of this amount. Finally, the state foreclosure property action was properly dismissed by Wells Fargo pursuant to K.S.A. 60-241(a)(1) and plaintiffs have failed to demonstrate how any hypothetical and hitherto unpled claims might invalidate the court's jurisdiction.

'The court notes that the defendants, in opposing the Motion to Remand, include a request for attorney fees as sanction against the plaintiffs for their repeated attempts to

8

relitigate issues previously decided by the court. In its discretion, the court denies the request for sanctions. In doing so, the court notes that the motions addressed herein were filed prior to the January 31, 2012 Order denying the plaintiffs' earlier attempt to circumvent Rule 7.3 [*sic*] However, plaintiffs are specifically admonished that any future attempts to relitigate issues already decided will likely result in the exercise of the court's inherent power to prevent such a waste of resources.'

"64.  The parties conducted 'exhaustive' discovery. During discovery, the parties served each other with requests for admission. The magistrate judge overruled the defendant's objections to five requests for admission. The magistrate judge imposed a $1,000 sanction on defendant's counsel for advancing objections to the requests for admissions, concluding that the defendant's objections were not advanced in good faith, were merely 'boilerplate' objections, and the information was readily available to defendants. The defendants filed an objection to the imposition of sanctions. The district court overruled the magistrate's decision and stated:

'. . . This is not a case in which defendants have cavalierly advanced boilerplate objections to a plaintiff seeking targeted, relevant discovery. Rather, the plaintiffs have sought discovery through carpet bombing; the defendants' use of similar language in their objections provides no basis for sanctions.'

"65.  On March 19, 2012, 17 months after initiating the suit, the respondent filed an amended petition, adding First American Title Insurance Company as a necessary party, related to its alleged role in the execution and recording of the caveat. The amended petition added an additional count for violations of the Real Estate Settlement Procedures Act (RESPA) and violations of the Kansas Consumer Protection Act.

"66.  On April 24, 2012, First American Title Insurance Company filed a motion to dismiss for failure to state a claim.

9

"67.     On May 15, 2012, while First American Title Insurance Company's motion to dismiss the petition was pending and after extensive discovery between the plaintiffs and Wells Fargo, MERS, and L.S. had been completed, and without leave of court, the respondent filed a first amended petition against First American Title Insurance Company and a second amended petition against Wells Fargo, MERS, and L.S.

"68.     On May 17, 2012, Wells Fargo, MERS, and L.S. filed a motion to strike the second amended petition.

"69.     On May 29, 2012, Wells Fargo, MERS, and L.S. filed a motion for summary judgment on R.B. and S.B.'s claims as well as the defendants' counterclaims. Regarding the defendants' counterclaims, the defendants sought '(a) equitable reinstatement of the October, 2008 mortgage, (b) an equitable mortgage based on the terms of the proposed new loan, or (c) judgment on its claim of unjust enrichment against [R.B.].'

"70.     In her opening statement, the respondent stated that Wells Fargo could have allowed R.B. and S.B. to sign the mortgage and give them what they promised in the refinance. Even though defendants were alternatively seeking 'an equitable mortgage based on the terms of the proposed new loan,' the respondent never offered to settle the case in that fashion. Counsel for Wells Fargo testified that had the respondent offered to settle the case by having R.B. and S.B. close on a loan with the terms of the refinance, counsel would have recommended to her client that the settlement offer be accepted.

"71.     To clearly understand the respondent's offers of settlement, during the hearing, the hearing panel asked the respondent to provide documentation of all settlement offers made in the underlying litigation. The respondent provided what has been admitted as Exhibit 66. According to Exhibit 66, on April 7, 2011, prior to when Wells Fargo entered the case, the respondent offered to settle the dispute with MERS and L.S. as follows:

10

'The Kansas Consumer Protection Act violations for deceptive practices carries a $10,000.00 penalty as to [S.B.] and $20,000.00 as to [R.B.] as a civil statutory penalty for each deceptive misrepresentation and unconscionable act. Those are outlined in the pleading estimating 18 violations at $30,000.00 for a total of $540,000.00 or a daily penalty of $30,000.00 which would be 510 days for a total of $15,300,000.00, plus my attorney fees at $250.00 per hour and their expenses.

'As you are aware, the issue of fraud and robo-signing has been an increasingly hot topic in the media. The public is very aware of the impacts of your clients' actions. There is no defense for the claims raised. Kansas is conservative but generally distrusting of large corporations. I feel that the claims of negligence and fraud will result in a backlash from the jury in a $500,000.00 to $1 million dollar award relating to the fraud, based on income.

'These claims can be combined.

'I have discussed the proposition of settlement with my client. [*sic*] They have authorized me to settle all claims against MERS and [L.S.] for significantly less at $750,000.00, contingent on a release of the documents in question. I feel this is a substantial reduction of value, not much more than the statutory remedies, costs, and attorney fees which take into account the reduction in time and further expenses relating to the hearing.'

"72.     In Exhibit 66, the respondent also referenced an inference, an offer, and an acknowledgment regarding settlement between the plaintiffs and defendants, including Wells Fargo. However, the respondent failed to provide any evidence of the inference,

11

offer, and acknowledgment. Further, counsel for Wells Fargo denied that the respondent offered to settle the case with Wells Fargo.

"73.     The Honorable J. Thomas Marten testified during the hearing on the formal complaint. Judge Marten offered testimony on this subject:

'No. Backing up to what I was saying early on is as one looks at this case, when everything else is cut away, [R.B. and S.B.] could have had their home, they could have had a lower payment. I think that they could have lived their lives in peace the few remaining years that they had, had they not been caught up in this vortex of—litigation. And I just found it sad because the [R.B. and S.B.], obviously, were good people. I think from some of the things I read in this case they lived in a mobile home for years and years that they bought on a contract for deed. They saved their money to buy this house. They went in to refinance the house, the refinancing was going to give them what they hoped to achieve, which was a slightly lower mortgage payment with a fixed rate mortgage, and somehow or another they end up, through a mistake that could have been corrected in 15 or 20 or 30 minutes, they end up enduring years of litigation, losing their home through a foreclosure sale, ending up having to pay more in terms of attorney's fees and costs than what the home was worth. And none of that, as I look at this, was necessary. I just— it—it really saddens me.'

"74.     On September 6, 2012, R.B. died.

"75.     On September 11, 2012, the district court granted First American Title Insurance Company's motion to dismiss for failure to state a claim. The district court held that the claims of title slander, fraud, conversion, and negligence as well as the RESPA

12

violations were barred by the statute of limitations. The district court found the remaining claims were conclusory assertions that failed to meet legal pleading requirements.

"76.     On October 4, 2012, in a memorandum and order which includes nearly 30 pages of findings of fact, the court granted the defendants' motion for summary judgment.

"77.     The court noted that the plaintiffs had two theories of damages. On the one hand, R.B. and S.B. were seeking statutory damages in the amount of $20,000 per day each from Wells Fargo, MERS, and L.S., personally. As of the date of settlement conference in June, 2011, the amount of damages sought exceeded $49 million, $16,530,000 from each of the three defendants. Alternatively, R.B. and S.B. sought $1,290,000 because of '43 false statements, unconscionable acts, and/or deceptive practices' in the two-page Caveat.

"78.     The court found that:

'Until the fact was brought to his attention at his deposition on March 28, 2012, [R.B.] was not aware he had filed suit against [L.S.]. [R.B.] testified that, in his mind, [L.S.] and Wells Fargo go hand-in-hand. Although he seeks $16 million personally from [L.S.], [R.B.] does not believe [L.S.] bore him any ill will.'

R.B. was unfamiliar with MERS. Additionally, the court noted that S.B. was unfamiliar with L.S. and MERS and did not know why she filed suit against L.S. and MERS. This is troubling to the hearing panel because while R.B. and S.B. thought they sued Wells Fargo, the respondent intentionally did not sue Wells Fargo and objected to Wells Fargo's motion to intervene.

13

"79.	In the order, the court also found that:

> '. . . Wells Fargo's business records demonstrate that [C.M.] communicated with [R.B. and S.B.] on June 16 and 22, indicating that a closing would take place in June 2009. She discussed the specific dates of June 24th or June 25, 2009. Further it is uncontroverted that the same business records show that [C.M.] also telephoned or left messages with [R.B. and S.B.] on May 20, May 21, May 28, June 4, June 10, June 18, and June 19, 2009.'

Despite the court's findings and the respondent's exhibits which establish the court's findings, the respondent has repeatedly asserted that R.B. and S.B. were not aware that they had to go to a closing and sign additional documents or that the closing was set for June 24, 2009.

"80.	In the order, the court separately considered each of the respondent's claims made on behalf of R.B. and S.B., as follows:

> 'Slander of title is the issuance of a false and malicious statement disparaging another person's title to real property and thereby damaging his interests. The requirement that the statement be malicious requires proof that the defendant did not act in good faith.

> '[R.B. and S.B.'s] slander of title claim rests on the recording of [the] Caveat but that document could not slander their title for the simple reason that it was true—[R.B. and S.B.] had not satisfied their obligations on the prior loan, and that the prior mortgage had been released in error. Accordingly, Wells Fargo was simply reasserting its claim on the property in a manner consistent with Kansas law.

14

'Nor was the Caveat malicious. In this context, maliciousness means doing a harmful act without an [*sic*] reasonable justification or excuse. [R.B. and S.B.] have produced no evidence that the defendants did not act in good faith in recording the Caveat, because Wells Fargo had a valid justification. . . . [R.B. and S.B.] have conceded that Wells Fargo retains some interest in the property, and thus it was not obliged to allow the record to continue to erroneously reflect that the property was unencumbered. By issuing the Caveat, the defendants advanced the public interest by warning third parties that the property was indeed subject to an existing and unsatisfied obligation.

'Finally, though, it must be stressed that such third parties are hypothetical only. That is, [R.B. and S.B.] have remained in the Property. They have not attempted to sell it, and have no plans to do so. Indeed, the Caveat was only discovered in the consequence of the present litigation. Accordingly, the plaintiffs have failed to demonstrate that they have been damaged in any way by the recording of the Caveat.

'Conversion under Kansas law is the unauthorized exercise of dominion and control [over] "goods or personal chattels belonging to another." A mortgage lien interest is not an interest that is capable of being converted. According, [*sic*] [R.B. and S.B.'s] claim that the defendants converted their "chain of title" fails to state a claim under Kansas law.

'[R.B. and S.B.'s] fraud claim asserts that the defendants committed fraud by recording [the] Caveat. Under Kansas law, fraud is "an untrue statement of fact, known to be untrue by the party making it, made with the intent to deceive or with reckless

15

disregard for the truth, upon which another party justifiably relies and acts to his or her detriment." Further, "[f]raud is never presumed and must be established by clear and convincing evidence." In the present case, [R.B. and S.B.'s] fraud claim fails because the Caveat represented a truthful statement (that [R.B. and S.B.] had not satisfied the underlying debt), and [R.B. and S.B.] never personally relied upon it (discovering only in the course of the present litigation), and did not do so to the detriment (since they have not attempted to sell their house and have failed to show that any third party has ever seen the document and acted against their interests[)].

'Next, [R.B. and S.B.'s] claim that the defendants acted negligently in recording the [C]aveat. The Court finds that this claim fails for the same reasons as [the] rest of [the] common law tort claims. The recording of the [C]aveat corrected the prior mistaken release of lien, and was an action authorized under Kansas law. As a result it did not breach any duty of due care owed to [R.B. and S.B.]. But the negligence claim also fails for a more fundamental reason. As lender and borrower, Wells Fargo and [R.B. and S.B.] had an adversarial relationship, and Wells Fargo was not obligated to act in [R.B. and S.B.'s] interest. Defendants MERS and [L.S.], acting as agents of Wells Fargo, similarly had no duty which was breached under the facts of the case.

'The KCPA prohibits deceptive practices in consumer transactions. A consumer transaction is "a sale, lease, assignment or other disposition for value of property or services within the state . . . to a consumer." In the present case, the communications between [R.B. and S.B.] and Wells Fargo were financial communications relating to a mortgage obligation, and thus do not fall within the scope of the KCPA. Further, [R.B. and S.B.]

16

failed to state a claim under the KCPA because they have shown no deceptive practice. The Caveat, as noted above, corrected the earlier erroneous release of the mortgage lien.

'Finally, [R.B. and S.B.] did not assert their RESPA claim until March, 2012, with their Amended Complaint. Such claims are subject to a one-year limitations period . . . Because [R.B. and S.B.'s] RESPA claim was brought more than one year after the closing of either the 2008 loan or the proposed new loan of 2009, the claim is time-barred.'

"81.    In the same order, the district court granted Wells Fargo's equitable counterclaim for reinstatement of the 2008 mortgage loan. The court also granted the defendants' motion to strike the second amended petition filed by the respondent, concluding that:

'. . . given the extensive discovery conducted by the parties, coupled with the simultaneous and exhaustive briefing on dispositive motions, the defendants would be substantially prejudiced by such far-reaching changes to the plaintiffs' claims.'

"82.    Following the entry of summary judgment, the defendants sought to recover expenses including attorney's fees in the amount of $289,096.00 and expenses in the amount of $9,204.15, as authorized by the mortgage. One of Wells Fargo's arguments in favor of the entry of attorney[']s fees was based on the exhaustive discovery propounded by the plaintiffs. The respondent made 318 discovery requests on the three defendants.

"83.    On November 29, 2012, the respondent filed a motion to strike the defendants' memorandum in support of the motion for attorney[']s fees.

"84.	On March 26, 2013, the district court granted the defendant's motion for summary judgment on the counterclaim for foreclosure and the defendant's motion for attorney[']s fees. The court denied the plaintiff's motion to strike. The court ordered R.B. and S.B. to pay defendant's counsel $289,096.00 in attorneys' fees and $9,204.15 in costs:

> 'Considering all the relevant factors, the court finds the requested attorney fee award, although substantial, is justified. Notably, the award here is larger than the expected value of the underlying mortgage interest. However, this must be balanced against the voluntary actions of the plaintiffs who have caused the present action to metastasize beyond any reason. It was the plaintiffs who initiated the present action, bringing claims for damages against MERS and individually against [L.S.], one of Wells Fargo's employees, seeking a judgment of $16 million. Even though Wells Fargo was obviously a proper party to the action, plaintiffs vigorously sought to prevent its joining the case.'

"85.	The sanction ordered by the court exceeds the principal sum of the mortgage by more than $100,000.00. The district court noted the 'barrage of discovery' propounded by plaintiffs, and that the 'court [was] forced to admonish plaintiffs against the repetition of losing arguments.' At the hearing on this matter, Judge Marten explained:

> 'Well, so much of that just rests on the actions of the plaintiffs and the filings in the case, the positions that plaintiff took, which resulted in the expenditure of far more time on the part of the lawyers than one would expect in this kind of a case. . . . [The sanction was] reasonable given the amount of work that was generated by plaintiff's handling of this action.'

18

"86.     The respondent appealed the district court's orders to the United States Court of Appeals for the Tenth Circuit. On February 24, 2014, the respondent filed her opening brief. In her statement of facts, the respondent failed to properly cite to the record on appeal. Additionally, rather than limit factual allegations to the statement of facts, the respondent included factual assertions throughout the brief. The vast majority of the respondent's factual assertions made in the argument portion of her brief did not include any citation to the record on appeal. Further, the respondent's brief is difficult to understand.

"87.     On April 28, 2014, S.B. died. As such, C.C., the administrator of S.B.'s estate, and B.B., the successor administrator for R.B.'s estate, became the named plaintiffs in R.B. and S.B.'s stead.

"88.     A three-member panel of the Tenth Circuit held oral argument on October 1, 2014. During the oral argument, panel members stated that they were unable to understand the case after reading the respondent's brief.

"89.     At the conclusion of the argument, the court asked the parties to provide evidence under Fed. R. App. Pro. 28(j) regarding whether Wells Fargo communicated a closing date to R.B.

'CIRCUIT JUDGE:  Your time is up. Now, somebody is not telling us the truth.

'MS. HUFFMAN:  I know. I have the truth right here, Your Honor. May I get these specific facts the specific page of exactly—

'CIRCUIT JUDGE:  I would like you to submit that to us.

'MS. HUFFMAN:  I will, Your Honor.

19

'CIRCUIT JUDGE: And I would like you to answer the question of whether or not—or what evidence do you have that [R.B. and S.B.] were never contacted. To me it seems unbelievable. And it seems unbelievable that the caveat, which was filed because no new mortgage was ever executed. I don't understand why you filed suit on that. And I'm extremely concerned about the way this case has been briefed.

'MS. HUFFMAN: And may I address those three issues to the Court in a written supplement?

'CIRCUIT JUDGE: Yes, you may.

'MS. HUFFMAN: I can do that also now. Can I give the—

'CIRCUIT JUDGE: No, you can do it in written—

'MS. HUFFMAN: That's fine. That's why I'm asking. I just wanted you to know I was able. So I will provide that written supplement to the Court. And should I go ahead and submit these uncontroverted facts or should I just that [*sic*] make them an attachment?

'CIRCUIT JUDGE: Now, say that again.

'MS. HUFFMAN: Yes. Fact 220, no closing date was arranged by Wells or the title company.

'CIRCUIT JUDGE: Now, who is that—who is saying that,—

20

'MS. HUFFMAN: That was our fact and they're going to agree to it in a second. The actual evidence is from Wells. It's Exhibit 61. It's an e-mail between Kessler at the title company and Wells on the internal investigation of what happened. It wasn't set up. That's uncontroverted at Volume IV, page 702. The other couple very good ones and I'll—

'CIRCUIT JUDGE: Just a minute.

'MS. HUFFMAN: Yes.

'CIRCUIT JUDGE: Counsel, do you have any record evidence that Wells were—or [R.B. and S.B.] were given a date for closing?

'MS. DONNELLI: Your Honor, there was an anticipated given and correspondence went out.

'CIRCUIT JUDGE: Do you have evidence of that?

'MS. DONNELLI: Yes, there is evidence of that and I can provide the record cite to the Court.

'CIRCUIT JUDGE: Would you please do it and send us a 28(j) letter. And you send us a 28(j) letter with anything you've got that supports the allegations that you have made in this case.

'MS. HUFFMAN: Yes, sir.

'CIRCUIT JUDGE: I'll be real honest with you, I've never seen a case as poorly put together as this one.'

Fed. R. App. Pro. 28(j) provides:

'Citation of Supplemental Authorities. If pertinent and significant authorities come to a party's attention after the party's brief has been filed—or after oral argument but before decision—a party may promptly advise the circuit clerk by letter, with a copy to all other parties, setting forth the citations. The letter must state the reasons for the supplemental citations, referring either to the page of the brief or to a point argued orally. The body of the letter must not exceed 350 words. Any response must be made promptly and must be similarly limited.'

"90.    In response to the court's invitation to provide the evidence regarding whether Wells Fargo communicated a closing date to R.B., the respondent sent the court (five or) six letters with attachments. Many of the attachments were identical.

"91.    Generally, rather than directly address whether Wells Fargo communicated a closing date to R.B., the respondent provided confusing information on a variety of subjects. Two of the letters and attachments were identical—J3 and J7. The record is unclear whether the respondent sent both of those letters to the Tenth Circuit or whether the respondent inadvertently included two copies of the same letter and attachments in her exhibits in the instant case.

"92.    Specifically, on October 15, 2014, the respondent sent the Tenth Circuit a letter and attachments. Included in the attachments was a copy of part of Wells Fargo's computerized system of recording communications found at Exhibit A-H53. In this letter to the Tenth Circuit, the respondent relied on certain pages of A-H53 to establish certain facts. However, the respondent failed to provide the Tenth Circuit with the portions of Exhibit A-H53 which established the communication between Wells Fargo and R.B. regarding closing.

22

"93.     Further, the respondent did not attempt to address the court's question about the communication of a closing date until her final post-argument letter to the court, dated October 27, 2014. In the body of the letter, the respondent failed to disclose the district court's findings regarding communications between Wells Fargo and R.B. regarding closing on the refinance. Additionally, the respondent failed to attach Exhibit A-H53, Wells Fargo's computerized system of recording communications which preserved the communications between Wells Fargo and R.B. regarding the status of the refinance and the tentative closing date.

"94.     In its written opinion, on November 12, 2014, the Tenth Circuit, addressing each of respondent's arguments on appeal, affirmed the district court. The Tenth Circuit concluded that the respondent either failed to establish any error or the respondent's arguments were supported by inadequate explanation or no legal support.

"95.     On December 1, 2014, the respondent petitioned the Tenth Circuit for rehearing *en banc.* On December 12, 2014, the Tenth Circuit denied the motion.

"96.     Wells Fargo paid its attorneys more than $600,000.00 to defend this suit.

*"The Foreclosure Action*

"97.     As stated in ¶ 60 above, on December 20, 2010, Wells Fargo filed a mortgage foreclosure action against R.B. and S.B. in Shawnee County District Court Case 10-CV-1808. The petition was properly served on December 23, 2010. On January 3, 2011, the respondent entered her appearance as counsel for R.B. and S.B. and requested a 14-day clerk's extension to answer or otherwise respond.

"98.     On January 6, 2011, Wells Fargo filed a Motion for Order of Dismissal, based on the litigation pending in federal court filed by R.B. and S.B. against MERS and L.S. At the time the motion was filed, the respondent had not filed an answer on behalf of R.B. and S.B.

23

"99.     On January 7, 2011, Wells Fargo's attorney emailed the respondent and informed her that the action was dismissed. The respondent confirmed receipt of the email by responding to it.

"100.     Even though the respondent knew the case was dismissed, on January 14, 2011, the respondent filed an answer and counterclaim. The respondent alleged conversion and violations of the KCPA. The respondent also filed a response to Wells Fargo's motion to dismiss, alleging the district court had jurisdiction to hear the matter because R.B. and S.B. were granted an extension of time to file an answer.

"101.     On February 4, 2011, the respondent filed a motion to amend and an amended answer and counterclaim asserting claims for breach of contract, breach of the duty of good faith and fair dealing, violations of RESPA, violation of the Truth in Lending Act, breach of fiduciary duty, negligence, slander of credit, conversion, fraud and misrepresentation, outrageous conduct causing severe emotional distress, and violations of the KCPA.

"102.     After receiving the respondent's motion to amend and amended answer and counterclaim, counsel for Wells Fargo wrote to the court seeking information on the procedural status of the action.

"103.     The district court allowed both parties to provide arguments and authorities in support of their respective positions. Consequently, on March 4, 2011, the respondent filed a reply to the letter brief, alleging that R.B. and S.B.'s counterclaim was pled prior to the service of Wells Fargo's motion to dismiss. On March 19, 2012, the respondent filed a second motion to amend, seeking to amend the first amended answer and counterclaim.

"104.     On March 23, 2012, the court held a hearing on whether the court had a foreclosure action before it. The court ruled that the case was dismissed upon the filing of Wells Fargo's motion to dismiss. The court directed Wells Fargo to prepare a journal entry and send it to the respondent under a local 10-day rule.

"105.    Without waiting for the journal entry, on April 2, 2012, the respondent filed a premature notice of appeal.

"106.    On April 4, 2012, counsel for Wells Fargo submitted a proposed Administrative Order regarding the dismissal to the district court. On April 9, 2012, the court entered the order, memorializing its earlier ruling that the case was dismissed upon the filing of the plaintiff's motion to dismiss.

"107.    On May 1, 2012, the respondent filed a motion to set aside or amend the order entered April 9, 2012. In the motion, the respondent alleged that counsel for Wells Fargo engaged in misrepresentation or misconduct under K.S.A. 2012 Supp. 60-260(b)(3), by falsely representing that the respondent approved the order. The respondent sought sanctions. On June 25, 2012, the court denied the respondent's motion.

"108.    On July 27, 2012, the respondent filed a notice of appeal. On July 19, 2013, the Kansas Court of Appeals upheld the district court's orders.

"Case No. 14-CV-4020

"109.    On December 12, 2013, while the appeal in case 10-CV-4141 was pending in the Tenth Circuit, the respondent filed another lawsuit in Shawnee County District Court, case 13-CV-1416, alleging the same claims that were on appeal in 10-CV-4141, against Wells Fargo Bank, Wells Fargo Home Mortgage, and the law firm representing Wells Fargo in the foreclosure action. The claims made against the law firm were premised entirely on its actions in seeking to protect Wells Fargo's mortgage interest in the property.

"110.    On March 25, 2014, the defendants removed the case to the United States District Court for the District of Kansas, case number 14-CV-4020.

25

"111.    On April 14, 2014, Wells Fargo filed a motion to dismiss the petition based on *res judicata*. On May 5, 2014, the law firm defendant filed a motion to dismiss. The respondent sought and received multiple extensions of time to file a response to the motions to dismiss.

"112.    Subsequently, on June 27, 2014, without leave of court, the respondent filed an amended petition, which advanced no new cause of action. The amended petition simply reworded a few of the allegations from the petition initially filed. Then, on June 29, 2014, again without leave of court, the respondent filed a motion to substitute the amended petition with a second amended petition. Included with the motion was a declaration and the second amended petition. In the declaration, the respondent averred that:

> 'Upon further reflection and consideration[,] the concerns that I have relating to the previous harsh words as consistent reminders by quoting this Court and raised in nearly every case I am Counsel, I felt regret that I did not plead in accordance with my true belief that this was not the original Note and insert more of the problems which occurred by the late and ever changing production in [R.B. and S.B.] v [*sic*] MERS.'

"113.    On September 12, 2014, the respondent filed a response to the two motions to dismiss which included a reply in support of the respondent's motion to amend the petition.

"114.    On December 30, 2014, the district court granted the motions to dismiss based on *res judicata*. The district court concluded that:

> '[10-CV-4141] was litigated fully. The plaintiffs [*sic*] claims included fraud, slander of title, conversion of "chain of title," breach of contract, anticipatory repudiation, negligence, detrimental reliance, unjust enrichment, violation of the Real

26

Estate Settlement Procedures Act (RESPA) and of the Kansas Consumer Protection Act (KCPA). The docket in that action comprises 393 separate pleadings and other events. In its summary judgment Order, the court explicitly recognized the discovery in that action was "extensive" and the briefing "exhaustive." This is [an] understatement. Wells Fargo grounded its summary judgment motion on 159 paragraphs of factual contentions. The plaintiffs controverted many of these facts, and asserted a further 102 paragraphs. The court resolved all factual and legal issues in the case in a lengthy opinion. The court granted summary judgment on Wells Fargo's counterclaim after receiving additional factual allegations and legal argument[.]

'[14-CV-4020] repeats the allegations advanced [in the earlier case], again focusing on the inadvertent release of lien and Wells Fargo's attempt to correct the error. Accordingly, the court finds that plaintiffs' claims are subject to dismissal under the doctrine of res judicata, which precludes the relitigation of issues which were previously litigated.'

The court concluded that the claims were also time barred. In conclusion, the court noted:

'More fundamentally, the allegation is emblematic of the entire case, first presented in [10-CV-4141] and now here. The passing of [S.B.] is unfortunate, as is the passing of her husband before her. It is doubly unfortunate that [R.B. and S.B.'s] last years were marked by the meritless litigation urged on by their counsel. The present litigation, . . ., is both unfortunate and unnecessary.'

"115. On January 27, 2015, the respondent filed a motion to alter or amend the court's judgment dismissing the case, again seeking relief for claims which had been

27

repeatedly dismissed. The respondent based her motion on Fed. R. Civ. Pro. 56. Fed. R. Civ. Pro. 56 provides procedures for filing a motion for summary judgment; not motions to alter or amend a judgment.

"116.    In the motion to alter or amend the judgment, the respondent did not allege a mistake in the facts or a mistake in the law as required. The respondent failed to present any newly-discovered evidence which would support reconsideration. Rather, the respondent's motion to alter or amend the judgment, was 'a repetition of earlier arguments made' in 10-CV-4141 and 14-CV-4020.

"117.    Additionally, in the motion to alter or amend the judgment dismissing the case, the respondent accused the judge of wrongdoing, directly and by innuendo. Specifically, the respondent stated:

'. . . The Court has a belief of what has happened and tells a story but appears to rely on assumptions, not supported by the record, . . . [.]

. . . [.]

'. . . [T]he Court rulings in this case seem to turn a blind eye to those problems.

. . . [.]

'. . . There can be no doubt there was a problem and that should not be ignored by this Court for judicial economy or to further protect Wells Fargo from the Plaintiffs who have not only a colorable claim, but a prima facie claim on some acts.

. . . [.]

28

'The commentary punctuates the socio[-]economic disconnect of the Court with these clients and generally the middle class public, particularly of color, who cannot afford the fights and discovery obstruction of the banks. The Court in this case ignored the admission that Wells did not own FHA Mortgages and reinstated an FHA instrument just removing the FHA protections generally. [R.B. and S.B.] took that in stride even though the Court made observations that were offensive and just accepted the ever changing word and position of Wells Fargo.

. . . [.]

'The Court is here to hear and decide cases but at every turn accepted Wells [*sic*] version over [R.B. and S.B.]. [R.B. and S.B.] knew they were likely to lose the house but they were entitled [to] the right to defend. Counsel can't look at individuals trying to defend and tell them it is a foregone conclusion. [R.B. and S.B.] are entitled [to] their day in Court. Being a man with a middleschool [*sic*] education from the Jim Crow South born to the cottonfields of Tennessee he was no stranger to being slighted and on the short end of the stick.

. . . [.]

'[R.B. and S.B.] and this Counsel have full respect of the Court thought [*sic*] frankly it appears that it may not run both ways.'

"118.   On February 27, 2015, Wells Fargo filed a four-page response in opposition to the respondent's motion to alter or amend the judgment.

"119.   On March 10, 2015, the respondent filed a request for an extension of time to file a reply to Wells Fargo's response to her motion to alter or amend the court's

29

judgment dismissing the case. The court denied the respondent's request for extension of time to file a reply.

"120.     Thereafter, on March 12, 2015, the respondent filed a five-page motion for reconsideration of the court's denial (of the respondent's motion for an extension of time to file a reply to Wells Fargo's response to the respondent's motion to alter or amend the court's judgment dismissing the case).

a.      In the motion, the respondent insinuated that the court found the respondent's advocacy 'distasteful.'

'There has been markedly different treatment between requests by this solo counsel and large firm counsel in both cases. An attorney with a firm of 50 or more local attorneys and multiple support staff is no questions asked, contrary to a disabled solo with no support staff providing more details to show cause still less favorable results.'

b.      The respondent argued that 'a homeowner should be able to defend his homestead without the critical commentary of the Court or under apparent threat.' The 'threat' that the respondent referenced is unclear to the hearing panel.

c.      In the motion, the respondent also referenced litigation filed by I. Dennis Hawver. The respondent implied that the judge was treating the parties differently because Mr. Hawver referenced the respondent in litigation.

'The differences might also be attributable to some hostility upon possible assumptions. Since this Counsel has recently found out that Your Honor has been sued and that somehow my name was provided as an example of something the party finds egregious it just casts doubts upon the case. I have not read a petition nor do I desire to do so however I am not a party and have not participated but know [*sic*] knowing Your Honor is in that case leaves unanswered questions and reservations.'

d.	In her motion, the respondent quoted Friedrich Nietzsche, a German philosopher:  'All things are subject to interpretation. Whichever interpretation prevails at a given time is a function of power and not truth.' By including that quote in her motion, the respondent implied that the court made its decisions based on power not based on truth.

e.	Finally, the respondent argued, 'I have no doubt that with a different judge [R.B. and S.B.] would have had a different result. As is true any day of the week in any of the courts.'

"121.	The court denied the motion to reconsider and the motion to alter or amend. In denying the motion to reconsider (the motion for extension of time to file a reply to the defendants' response to the motion to alter or amend), the court stated, '[t]he suggestion that the court has not been accommodating to counsel or bears her any personal animosity is completely devoid of any rational basis in fact.'

"122.	On August 12, 2014, Wells Fargo filed a motion for sanctions against the respondent. Prior to filing the motion to sanctions, counsel for Wells Fargo provided the respondent with a copy of the motion, and suggested that the respondent avoid the motion by dismissing the suit. The respondent refused to dismiss the lawsuit, comparing the litigation to *Plessy v. Ferguson.*

"123.	After the motion for sanctions was filed, the respondent sought repeated extensions of time to respond to the motion. On December 22, 2014, the respondent filed a response. In the response, the respondent asserted:

	'Counsel has extensive mortgage litigation experience
	and even more extensive mortgage industry experience. I have
	consistently sought to have the minimum required standing as
	the party in interest which is under the plain language of the
	statute the owner of the Mortgage, not the Note. Discovery

31

obstruction and misrepresentations by Ms. Donnelli has [*sic*] been [R.B. and S.B.'s] problem.

'The idea that this Counsel should not be able to hail Wells Fargo into court when they knew they had an assignment presented to the Tenth Circuit that they failed to provide this Court and was known to be contrary to their consent orders and also triggered a statutory disclosure which was concealed is the motivation for the pleading not an actual articulated Rule 11 violation. Rather protection and control from known additional acts even when there can be no doubt that the underlying claims were never disposed of in summary judgment as they were always part of another action.

'Notably, the mantra of Wells that haunted [R.B. and S.B.] was attempted to beaddressed [*sic*] in the Rule 11 notice to Ms. Donnelli that sat under an unheard motion for a protective order for nearly a year.

'This Court in hindsight can see that the law moves favorably for the consumers. Wells is pleading in broad strokes but that is not what is required under Rule 11. There is no doubt that this specific counsel is a thorn in their side but that is no reason for the Court to be duped into allowing signing Counsel to stop litigation which is intended to protect consumers and is not only supported but definitely where the law has moved.

. . . [.]

'An interesting perspective for the Court may be to read the story of [R.B. and S.B.'s case] using only what Wells specifically stated was "uncontroverted" [*sic*] Exhibit 9 from the first page until FN3 on the last page is comprised 100% of the

32

facts in [R.B. and S.B.'s case] that the parties agreed, specifically Wells, agreed were uncontraverted. [*sic*] Exhibit 10 is a short list of the specific support for this statement. The objective facts are that we recognize this Court found [R.B.] a "sophisticated borrower" so it is a legal reality, but even a "sophisticated borrower" can maintain actions pled in this case which were always subjects of a different case and not included in the summary judgment.

'Even though the legal fact is [R.B.] was sophisticated this Counsel can maintain an objective knowledge that [R.B.] only had a middle school education in the Jim Crow south and was embarrassed in his deposition because he could barely read. Should it be now that every individual with a middleschool [*sic*] education is sophisticated and none may maintain actions? I don't think this Court intended on that proposition nor would I fail to plead for a client with a GED that they have defenses. Nor does Rule 11 expect this Counsel to do so.

'The Court should at least be interested, if not have a duty, to look into the conduct of Wells, especially now with this "assignment" concealed from this Court during the last [case involved R.B. and S.B.] Do we let bully banks run the few borrower attorneys out of the courtroom or just the ones who have actual industry knowledge and can muster support from industry experts. The Court was never aprised, [*sic*] as the situation did not arise, that the "expert" for Wells clearly perjured himself during the deposition. [S.B.] was forced to watch this however her pure spirit provided express consent to release the deposition so that others facing him as an expert could benefit from what we had started. In the last instance that this Counsel is aware of the contact for that firm advised that he left the room in tears after being faced with that deposition. . . .

'An attorney should not be forced to ignore what they know or be afraid to approach the Court. I admit to being fearful, not that what I have pled is wrong or is not supported I have full faith that isn't the case, but rather from the harsh reprisals of this Court when impacting my reputation with the discovery comments which, again with every due respect, were not analyzed and contrary to what I expected as a mortgage professional for over 15 years prior to the pleading.

'Given the opportunity to delve into the issues, this Counsel strongly believes the Court will come to the realization that Wells pulled the wool over his eyes. If that is not the case, it is still not a Rule 11 violation to plead these claims which were not resolved, which were under court process at a parallel time, and which were newly discovered.

'When deceit abounds this Court cannot ignore that [R.B. and S.B.] may maintain a cause of action and should be allowed to prove the constructive fraud, [*sic*]

. . . [.]

'[R.B. and S.B.'s case] continues to discover issues and the Court should not be trampling on [R.B. and S.B.'s] graves or this Counsel by another harsh remedy without first doing an inquiry into these facts and new situations. The Court owes it to me to look me in the eyes before rendering more reputational damage.

. . . [.]

'All jurists are generally aware that *Plessy v. Ferguson* was our Supreme Court establishing well settled "separate but equal." It took about 70 years for attorneys to make the headway to what we all know as a truism, separate cannot be equal which was developed by a series of cases finally now well settled in *Brown v. Board of Education.*

. . . [.]

'Wells uses this motion to chill litigation and Counsel uses this motion to avoid inquiry on the issues known to those who have watched the national crisis and these facts develop over the last 3 years, a fast track of changes in newly emerging areas of law.

'If the Court merely wants to stop litigation for any borrowers then the fastest way to do it is more sharp tongued commentary or granting this motion. However, this Counsel can be beat to the ground but eventually another will stand in my place. The Court can take sides now or judicially allow the case to proceed and facts to be developed. The issues were bigger than [R.B. and S.B.] and they are bigger than these two Counsel but no Court should stand by and not take a second look when more conflicting documents arise particularly when that specific assignment triggered statutory notice if not equitable notice and was concealed until presented to another Court for reliance which did or may have impacted the ultimate outcome of the case.'

"124. On March 18, 2015, the district court considered Wells Fargo's motion for sanctions.

35

'In determining whether to assess sanctions, the court takes note of the substantial award of attorney fees granted Wells Fargo in [10-CV-4141]. However, the award in [10-CV-4141] served no punitive purpose. The amount of fees was never directly challenged by the plaintiffs. Rather, the court stressed that the size of the award was directly proportional to the "unbounded aggressive strategy" employed by plaintiffs' actions in extensive and needless discovery and meritless legal argument. The court further noted that it had been explicitly forced to "admonish plaintiff against the repetition of losing arguments."

'Rather than taking these repeated admonitions to heart, counsel instituted [14-CV-4020], and has never presented any colorable rationale why the principle of res judicata would not apply. Moreover, none of the considerations recognized in other cases as mitigating against an award of sanctions is present here. The motion for sanctions is not directed at a *pro se* litigant, but at counsel. There was no intervening court decision which might arguable [*sic*] justify the filing of a second action. The court concludes that the filing of [14-CV-4020] was not objectively reasonable.

'*Amount of Sanctions*

'Plaintiffs' response to the Motion for Sanctions wholly fails to address the appropriate *type* or *amount* of sanctions to be imposed in light of the factors recognized in *White*. The response, moreover, fails to even acknowledge the elements of res judicata. Indeed, the response mentions the doctrine in a single passage, in its conclusion, with plaintiffs suggesting the doctrine is irrelevant in [14-CV-4020] because "the claims pled were not before the Court" previously in [10-CV-4141]. This

36

misunderstands res judicata, which as noted in the court's earlier Order, applies to claims which were *or could have been* brought in the earlier action. . . . [P]laintiffs' claims in [14-CV-4020] "all related in time, space and origin to the relevant facts in [10-CV-4141] complaint," and arise "out of the same transaction or series of connected transactions," and are consequently barred by res judicata.

'No amount of intemperate language can remedy this legal flaw. Indeed, counsel's hyperbolic language ("this Counsel can be beat to the ground but eventually another will stand in my place" and "[t]he issues in [14-CV-4020] were bigger than [R.B. and S.B.] and they are bigger than these two Counsel") raises the concern that even now counsel fails to understand [the] finality of the court's orders, thereby directly highlighting the need for some minimum sanction sufficient to deter [another lawsuit].'

Concluding that the time to end this litigation was well past, the court granted the motion for sanctions and enjoined the respondent from 'filing any future litigation on behalf of [R.B. and S.B.] or their estate representatives.'

"125.    At the hearing on this matter, Judge Marten testified about the respondent's hyperbolic and intemperate language, the injunction, and the sanction imposed:

'Q.    You delayed that decision, but over on page 797, you raised a concern about what you consider to be intemperant [*sic*] and hyperbolic language. Would you explain that, please?

37

'A. Yes. The concerns that I see in—and if I might back up a little bit on this, too, one of the lessons that I learned pretty early on, and I had some great mentors in this respect, were if you take your eye off of what you're trying to accomplish, if you get distracted by opposing counsel, irritation with them or irritation with the judge, you lose your focus on what you're really trying to accomplish, and that does not serve your clients well. And, so, when I read comments like "this counsel can be beat to the ground, but eventually another will stand in my place," first of all, it was hard for me to understand why that kind of a statement would be made, given the conduct of opposing counsel in this case. And in my view, and I know it's only mine, but I bent over backward, I think, in this case to try to be fair to [R.B. and S.B.] and their counsel. And nothing that I said or did was intended to beat anybody to the ground at all.

 'It was simply to point out, you know, you're practicing law, you're in court here, there are certain things you have to do, there are certain things that you shouldn't do, and keep these things in mind as we go along.

 'And the finality of the court's orders was one of these things. I've told lawyers before, if you're in court to do anything or to prove anything other than your case to the trier of fact, you're in the wrong place. And there may have been some larger claim of conspiracy or some thought that Wells Fargo, and it certainly had its share of bad press over the past few years with some of the things that have happened there, but I never saw anything that smacked of anything other than utter good faith on the

38

part of the defendants in this case. And, frankly, I think that [R.B. and S.B.], the parties probably—you know, I think most clients are influenced by their counsel, and I have no idea what Ms. Huffman was advising them as they went along, but it seemed to me, given their answers in depositions and so forth, that they were just kind of following a lead that was provided to them. And I think that the language about beating counsel to the ground and somebody else stepping up and taking place and that the case being much bigger than [R.B. and S.B.], well, for me the case was [R.B. and S.B.] they were dealing with and, again, trying to resolve the matter. So, I found the language intemperate and hyperbolic.

'Q.     You indicated you were concerned about whether or not, even at that point, Ms. Huffman understood the finality of the orders?

'A.     Yes.

'Q.     So you took what probably is kind of an unusual action in this case in terms of a sanction?

'A.     I think I have granted sanctions in two cases. One was very early on in my career and it was pretty mild. And, actually, I thought even this sanction that I imposed here, after I asked the Wells Fargo folks to provide their time and billing records and so forth to me, was much, much lower, obviously, than what they had requested in the way of—of sanctions. And, again, it was—I didn't want to punish anybody. I simply wanted to make the point that we have rules that have to be followed, and

39

you can only ignore them so many times before it's obvious that the message is not getting through.

'Q.     Here you—on page 797 of Exhibit 42 you enjoined Ms. Huffman from filing any further litigation on behalf of [R.B. and S.B.] or their estate—

'A.     Yes.

'Q.     —representatives? And I think there was a request from Wells Fargo that you do that. 'Um, have you ever done that before, enjoining somebody from filing any further litigation?

'A.     Only one other party, and it was a pro se filer who had significant mental health issues, and he was attempting to file things like packets of ketchup with the court. And he was somebody who would get on his meds and be fine, then he'd go off his meds thinking he was fine, and he would be back with a paper bag full of papers and other items that—that—but I think that this is the only other time that I have prohibited or enjoined someone from filing a case. And, of course, this was only on behalf of [R.B. and S.B.]. It didn't extend beyond that.'

"126.   On April 17, 2015, prior to the date the district court determined the amount of sanctions, the respondent filed a notice of appeal, appealing eight orders entered by the district court to the Tenth Circuit.

"127.   Counsel for Wells Fargo sought $49,907.52 in attorney[']s fees and $461.24 in expenses. To ensure that the underlying conduct would not be repeated in the future, on June 18, 2015, the court assessed a $5,000 sanction against the respondent. The respondent paid the sanction.

40

"128.   In early February, 2016, the respondent attempted to file her opening brief. The Tenth Circuit rejected her brief because it was deficient. On February 11, 2016, the respondent filed her opening brief. Thereafter, the defendants' filed responsive briefs.

"129.   On March 2, 2017, the Tenth Circuit Court of Appeals affirmed the grant of summary judgment and the award of sanctions, finding that the respondent's argument 'made no sense and was hard to follow,' was 'unsupported by the record,' was 'meritless,' and was 'woefully inadequate.'

"130.   On March 16, 2017, respondent petitioned the Tenth Circuit for rehearing *en banc.* On March 28, 2017, the Tenth Circuit denied the motion.

"131.   Wells Fargo paid its attorneys more than $100,000.00 to defend this suit.

"132.   In 2012, Matthew Boddington filed a complaint with the disciplinary administrator's office. In Mr. Boddington's complaint, he made a reference to the litigation involving R.B. and S.B. Mr. Boddington, however, was not involved in R.B. and S.B.'s cases.

*"Conclusions of Law*

"133.   Based upon the findings of fact, the hearing panel unanimously concludes as a matter of law that the respondent violated KRPC 1.1 (competence), KRPC 3.1 (meritorious claims), KRPC 3.3 (candor to the tribunal), KRPC 3.5 (impartiality and decorum of the tribunal), KRPC 8.2 (judicial and legal officials), and KRPC 8.4 (professional misconduct), as detailed below.

"134.   The hearing panel also concludes that the disciplinary administrator did not present clear and convincing evidence that the respondent violated KRPC 3.2 (expediting litigation) and KRPC 3.4 (fairness to opposing counsel). The allegations that the respondent violated KRPC 3.2 and KRPC 3.4 are dismissed.

41

"135.    The hearing panel concludes that the allegations that the respondent violated KRPC 3.3 (candor to the tribunal) for making false and disparaging statements regarding Judge Marten constitute violations of KRPC 3.5 (impartiality and decorum of the tribunal) rather than KRPC 3.3. Accordingly, the allegations that the respondent violated KRPC 3.3 are dismissed.

"136.    Kan. Sup. Ct. R. 202 provides, in pertinent part, as follows:

'A certificate of a conviction of an attorney for any crime or of a civil judgment based on clear and convincing evidence shall be conclusive evidence of the commission of that crime or civil wrong in any disciplinary proceeding instituted against said attorney based upon the conviction or judgment. . . . All other civil judgments shall be prima facie evidence of the findings made therein and shall raise a presumption as to their validity. The burden shall be on the respondent to disprove the findings made in the civil judgment.'

The disciplinary administrator relies on orders, judgments, and opinions of the United States District Court for the District of Kansas, the United States Court of Appeals for the Tenth Circuit, the Shawnee County District Court, and the Kansas Court of Appeals. Under Kan. Sup. Ct. R. 202, the hearing panel concludes that the respondent failed to disprove the findings made in the civil judgments and, as a result, the hearing panel accepts the orders, judgments, and opinions entered into the underlying civil cases.

"KRPC 1.1

"137.    Lawyers must provide competent representation to their clients. KRPC 1.1. 'Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.' *Id*. The hearing panel acknowledges that the respondent is experienced in the field of mortgage lending and

42

represented her clients as a zealous advocate. However, the respondent's experience in mortgage lending, is not tantamount to competence as a mortgage litigator.

"138. The hearing panel concludes that the respondent failed to provide competent representation to R.B. and S.B. when she failed to offer to settle the case by seeking to have her clients close on a mortgage under the terms negotiated in 2009.

"139. The hearing panel also concludes that the respondent lacked the ability to understand when she had a losing case. She failed to recognize how to resolve the case to her clients' benefit.

"140. Further the following instances, taken together also establish the respondent's lack of competence as a litigator:

   a. The respondent failed to timely file two motions: (1) a motion to reconsider the magistrate judge's order allowing removal to federal court and (2) a motion to reconsider the magistrate judge's order allowing Wells Fargo to intervene. The respondent filed the two motions more than four months after the order, rather than within 14 days as required by the court rules.

   b. The respondent alleged that the federal court lacked jurisdiction over MERS. The respondent failed to recognize that the requirements of diversity of citizenship jurisdiction was satisfied.

   c. In 10-CV-4141, the respondent filed an amended petition without seeking leave of court to do so. Additionally, in 14-CV-4020, the respondent filed an amended petition and a motion to substitute the amended petition with a second amended petition, again, without seeking leave of court to do so.

   d. The respondent failed to properly plead claims in a petition; rather, the respondent simply made conclusory assertions.

43

e. The respondent included claims in her petitions and amended petitions that were well outside the statute of limitations.

f. The respondent did not adequately explain to her clients who they filed suit against; or conversely, the respondent failed to file suit against the party which her clients intended her to sue.

g. The respondent included claims for conversion in the petitions and amended petitions. Conversion is the unauthorized exercise of dominion and control of goods or personal chattels. The causes of action did not involve goods or personal chattels.

h. Before the Tenth Circuit and in her representation of herself in the instant case, the respondent relied on and presented documents which she referred to as uncontroverted facts as evidence. The documents, however, appear to be the respondent's work-product rather. A summary of facts assembled by the respondent is not evidence of the facts.

i. The respondent failed to provide Exhibit A-H53 in its entirety in response to the Tenth Circuit's request for evidence of communications between Wells Fargo and the plaintiffs regarding closing.

j. The respondent filed an answer and counterclaim, a motion to amend, and an amended answer and counterclaim in a case which she knew had previously been dismissed. Further, after the parties briefed the issue for the court, the respondent filed a second motion to amend.

k. The respondent twice filed a premature notice of appeal.

l.      The respondent filed the cause of action which later became 14-CV-4020 even though it was clearly barred by *res judicata*. Based on the respondent's filings, it is clear that she does not understand the legal principle of *res judicata.*

m.      The respondent filed a motion to alter or amend the judgment after the judge dismissed the case. The respondent based her motion on Fed. R. Civ. Pro. 56. Fed. R. Civ. Pro. 56 provides the procedures required to file a motion for summary judgment. Fed. R. Civ. Pro. 56 is not relevant to consider in ruling on a motion to alter or amend the order granting a motion to dismiss.

n.      The respondent filed a motion to alter or amend a judgment, not because there was a mistake in the facts or law, but simply to get a second chance for a favorable ruling. Motions to alter or amend are proper only for occasions when there is a mistake in the facts or in the law or when there is newly discovered evidence.

o.      The respondent failed to properly cite to the record in her briefs before the Tenth Circuit. Additionally, the Tenth Circuit was unable to understand the respondent's arguments and the respondent's arguments 'made no sense and was hard to follow,' was 'unsupported by the record,' was 'meritless,' and was 'woefully inadequate.'

The hearing panel concludes that her failure to offer to settle the case by obtaining the refinance mortgage her clients sought and her failure to recognize that she had a losing case, coupled with the additionally specific instances where the respondent failed to provide R.B. and S.B. with competent representation, violate KRPC 1.1.

"KRPC 3.1

"141.    Attorneys are prohibited from bringing or defending a proceeding unless there is a basis for doing so that is not frivolous. KRPC 3.1. While 10-CV-4141 was on

45

appeal with the Tenth Circuit, the respondent initiated another lawsuit in Shawnee County District Court based on the same set of facts. That case was removed to federal court and became 14-CV-4020. The district court held, and the hearing panel agrees, that it was not objectively reasonable for the respondent to bring what became 14-CV-4020. The hearing panel concludes that there was no basis to bring suit against Wells Fargo in Shawnee County District Court, in what later became 14-CV-4020.

"142.    In the foreclosure case, the respondent filed an answer and counterclaim, a motion to amend, and an amended answer and counterclaim after the foreclosure case had been dismissed by the Shawnee County District Court. Then, after the parties briefed whether the action was still alive but before the court ruled, the respondent filed a second motion to amend the petition. The hearing panel concludes that there was no basis for filing the answer and counterclaim, the motion to amend, the amended answer and counterclaim, and the second motion to amend because the case had been dismissed.

"143.    Additionally, throughout the litigation, the respondent repeatedly filed motions seeking reconsideration of matters which had been fully considered. The district court repeatedly admonished the respondent to refrain from doing so. Despite the district court's repeated admonitions, the respondent continued to relitigate matters which had been previously fully addressed. As such, the hearing panel concludes that the respondent violated KRPC 3.1.

"KRPC 3.5 and KRPC 8.2

"144.    KRPC 3.5 prohibits attorneys from engaging 'in undignified or discourteous conduct degrading to a tribunal.' KRPC 3.5(d). Additionally, '[a] lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge.' KRPC 8.2(a).

"145.    The respondent engaged in undignified and discourteous conduct degrading to a tribunal and the respondent made statement[s] that she knew to be false or with reckless disregard as to the truth or falsity of the statements when she made statements about Judge Marten that had no basis in fact. The hearing panel concludes that

46

the degrading statements, detailed below, were made with reckless disregard to the truth or falsity of the statements, in violation of KRPC 3.5(d) and KRPC 8.2(a).

    a. The respondent recklessly made false statements of material fact to the district court in her motion to alter or amend when she (1) falsely alleged that the judge relied on assumptions not supported by the record, (2) falsely accused the judge of turning a blind eye to problems in the case, (3) falsely accused the judge of making rulings based on judicial economy or to protect the defendants from the plaintiffs, (4) falsely accused the judge of racial discrimination, (5) falsely accused the judge of accepting the defendants' statements while discounting the plaintiffs' statements, and (6) falsely stating that the judge was putting R.B. on the short end of the stick.

    b. The respondent also recklessly made false statements of material fact to the district court in her motion for reconsideration (of the court's denial of the respondent's motion for an extension of time to file a reply to Wells Fargo's response to the respondent's motion to alter or amend the court's judgment) when she (1) falsely accused the judge of treating her differently than opposing counsel when she is a solo disabled attorney, (2) falsely accused the judge of treating her differently than opposing counsel because Mr. Hawver referenced the respondent in litigation, (3) falsely implied that the court made its decisions based on power rather than truth, and (4) without a reasonable basis, speculated that her clients would have received different results with a different judge.

Accordingly, the hearing panel concludes that the respondent violated KRPC 3.5.

"KRPC 8.4

"146. 'It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice.' KRPC 8.4(d). The respondent engaged in

47

conduct that was prejudicial to the administration of justice when she repeatedly attempted to relitigate issues fully considered. Judge Marten hit the nail on the head when he said:

> '. . . I admire vigorous lawyers. I admire lawyers who are willing to go to the mat for their clients, and I have never penalized, ever, a lawyer for doing that. I think that's what they're supposed to do, but it also has to be done within the context of our system.

> 'You know, I've often said that if everybody just kind of did what they were supposed to, we wouldn't need rules at all, . . . And a lot of these rules that we've put in place over the years are just as a result of either abuses or perceived abuses of the process. And it grieves me, frankly, to be here today with Ms. Huffman because I think that she honestly was doing the very, very best job that she could for [R.B. and S.B.], but I also think there's got to be a certain amount of judgment that's involved in the decisions that you make about when do you finally say, okay, I understand there's no place else to go with this. And that is not what happened in this case with Ms. Huffman.

> 'And when you say these have been decided, the circuits affirmed it, don't bring anymore. And this, of course, was before the circuit affirmation, but don't bring anymore of these. We've been through that, they've been decided, let's move on to the next thing and advance the litigation. And when they— when you have these kinds of discovery matters from [the first case] raised in a purported amended complaint in [the second case], it does fly in the face of the prior rulings, and the reconsideration motions, and all of the other things that we had looked at in relation to [the first case].

> 'So, yes, I—I—I consider that to be a violation of the earlier admonitions not to revisit these matters again, . . . I felt this was a violation of those orders.'

48

Ultimately, the court ordered the respondent to pay a sanction in the amount of $5,000 and enjoined the respondent from filing . . . suit on behalf of the estates of R.B. and S.B. in the future. The hearing panel concludes that the respondent's conduct in this regard amounts to a violation of KRPC 8.4(d).

"147.    Further, the respondent's false statements regarding the judge's integrity referenced in ¶ 145 above also amount to professional misconduct that is prejudicial to the administration of justice. Thus, the hearing panel concludes that the respondent violated KRPC 8.4(d).

*"American Bar Association*
*Standards for Imposing Lawyer Sanctions*

"148.    In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"149.    *Duty Violated.* The respondent violated her duty to her clients by failing to provide competent representation. The respondent also violated her duty to the public, the legal system, and the legal professional [*sic*] by failing to maintain her personal integrity. Finally, the respondent violated her duty to the legal system and the legal profession by engaging in conduct that was prejudicial to the administration of justice.

"150.    *Mental State.* The respondent knowingly violated her duties to her clients, the public, the legal system, and legal profession. While the respondent engaged in knowing misconduct, it is important to know that the respondent engaged in the misconduct in a crusade to defend clients she believed were being crushed by a mortgage company; not in a scheme designed to benefit the respondent financially.

49

"151.    *Injury*. As a result of the respondent's misconduct, the respondent caused actual harm to her clients, to the legal system, and the legal profession. R.B. and S.B.'s final years were spent in unnecessary litigation. The respondent's misconduct resulted in a court order requiring R.B. and S.B. to pay nearly $300,000 in attorney[']s fees and expenses. The respondent filed unnecessary petitions seeking court review of the same issues over and over again resulting in the waste of judicial time and resources. Finally, the conduct of the respondent by including false statements regarding a federal judge in court documents brings disrepute to the legal profession.

"Aggravating and Mitigating Factors

"152.    Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

      a.     *A Pattern of Misconduct*. The respondent engaged in a pattern of misconduct by failing to provide competent representation to R.B. and S.B. throughout the litigation. Additionally, the respondent engaged in a pattern of misconduct when she repeatedly asserted the same claims and repeatedly sought reconsideration of matters already ruled on despite multiple admonitions by the court. Finally, the respondent engaged in a pattern [of] reckless conduct regarding the discourteous statements made regarding the judge's integrity. As such, the hearing panel concludes that the respondent engaged in patterns of misconduct.

      b.     *Multiple Offenses*. The respondent committed multiple rule violations. The respondent violated KRPC 1.1 (competence), KRPC 3.1 (meritorious claims), KRPC 3.5 (impartiality and decorum of the tribunal), KRPC 8.2 (judicial and legal officials), and KRPC 8.4 (professional misconduct). Accordingly, the hearing panel concludes that the respondent committed multiple offenses.

c.   *Refusal to Acknowledge Wrongful Nature of Conduct.*
The respondent has refused to acknowledge the wrongful nature of her
conduct. In her closing argument, the respondent argued that she did not
violate any rules. The respondent came close to admitting that she
violated KRPC 8.2 when she stated in closing argument:

> '. . . And I would say as to 8.2, I own it. Frankly, I don't
> think I made any false statements. I infer that someone
> believes that I've said that the Judge was biased against
> my client, . . .'

The hearing panel is concerned, that at this late date, the respondent just
does not seem to 'get it.' She is either unwilling or unable to acknowledge
that what she did [in] this case—repeatedly filing lawsuits when the
issues had already been resolved and by making false and disparaging
statements about a judge—violates the Kansas Rules of Professional
Conduct. Accordingly, the hearing panel concludes that the respondent
refused and continues to refuse to acknowledge the wrongful nature of
her conduct.

d.   *Vulnerability of Victim.* R.B. and S.B. were vulnerable to
the respondent's misconduct. Much has been made regarding R.B. and
S.B.'s level of sophistication. On the one hand, R.B. obtained a mortgage
in 2008 and should have been familiar with what was required to
refinance the mortgage six months later. On the other hand, R.B.'s
education was limited to middle school and, it appears, prior to 2008, he
had not obtained a mortgage. Regardless of whether R.B. and S.B. were
sophisticated or not, they relied on the respondent. They believed that
they had filed suit against Wells Fargo in 10-CV-4141, when they had
not. The litigation approach was driven by the respondent, rather than by
R.B. and S.B. Based on the respondent's approach to the litigation, R.B.
and S.B. were ordered to pay nearly $300,000 in attorney[']s fees and

51

expenses. Accordingly, the hearing panel concludes that R.B. and S.B. were vulnerable to the respondent's misconduct.

"153.    Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

a.        *Absence of a Prior Disciplinary Record*. The respondent has not previously been disciplined.

b.        *Personal or Emotional Problems if Such Misfortunes Have Contributed to Violation of the Kansas Rules of Professional Conduct*. In 2011, the respondent was in a serious car accident. As a result, she suffered a traumatic brain injury. The effects of the traumatic brain injury are ongoing. Additionally, as a result of the accident, the respondent suffers from depression. The ramifications of the accident contributed to her misconduct. The respondent summarized her difficulties in her argument regarding factors in mitigation:

'The meat of the discovery all occurred within a month after the accident, prior to being put on brain rest and before the first anniversary of the accident. Although I came up with significant legal theories on abstention doctrines and was learning through a first run on some of the mortgage transfer issues, I was struggling more than anyone (including myself) was aware. I'm sure I did re-run some arguments because even now I can be a bit circular, long-winded, and repetitive however that was much more in the past. The chart I made was not just for the court, it was to keep the claims straight for myself.'

c.        *Inexperience in the Practice of Law*. The Kansas Supreme Court admitted the respondent to the practice of law in 2010.

The respondent's misconduct began shortly after her admission to the practice of law. The respondent's inexperience in the practice of law mitigates her misconduct. Further, the respondent stated during the hearing that '[h]ow [she] handled [the cases] would not be how [she] would handle them now.'

d.    *Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney*. The respondent is a member of the bar of Oskaloosa, Kansas. The respondent presented evidence from S.B., Larry Rute, A.W. Pickel, David C. Kirk, Alexandria S. Belveal, and A.S., in support of her good character. Additionally, the respondent presented additional evidence of her good character.

e.    *Imposition of Other Penalties or Sanctions*. The court sanctioned the respondent $5,000 in the second federal suit. The respondent paid the sanction. The hearing panel concludes that the respondent experienced another sanction for her misconduct.

"154.    In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

'4.52    Suspension is generally appropriate when a lawyer engages in an area of practice in which the lawyer knows he or she is not competent, and causes injury or potential injury to a client.

'4.53    Reprimand is generally appropriate when a lawyer:

'(a)    demonstrates failure to understand relevant legal doctrines or procedures and causes injury or potential injury to a client; or [. . .]'

53

'5.11    Disbarment is generally appropriate when:

. . . [.]

'(b)        a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that serious[ly] adversely reflects on the lawyer's fitness to practice.'

'5.13    Reprimand is generally appropriate when a lawyer knowingly engages in any other conduct that involves dishonesty, fraud, deceit, or misrepresentation and that adversely reflects on the lawyer's fitness to practice law.

'6.12    Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

'6.13    Reprimand is generally appropriate when a lawyer is negligent either in determining whether statements or documents are false or in taking remedial action when material information is being withheld, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

'6.21    Disbarment is generally appropriate when a lawyer knowingly violates a court order or rule with the intent to obtain a benefit for the lawyer or another, and causes serious injury or potentially serious injury to a party, or causes serious or potentially serious interference with a legal proceeding.

'6.22 Suspension is appropriate when a lawyer knowingly violates a court order or rule, and there is injury or potential injury to a client or a party, or interference or potential interference with a legal proceeding.'

'7.1 Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system.

'7.2 Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.'

*"Recommendation of the Parties*

"155. The disciplinary administrator recommended that the respondent's license to practice law be indefinitely suspended.

"156. The respondent recommended that she receive a private admonition and 'time served.' In her mitigation factors document, the respondent stated:

'Anything the panel feels I have done has been paid for in spades with over six years of the process which continues. I feel that it is time to show mercy and that any punishment has been served during this long process. I've been humiliated enough. I was sanctioned by the same Judge, who despite being aware of everything before the panel did not turn this conduct over. He felt $5,000.00 was sufficient and I paid it (not my clients of course).

55

'Additionally, the time itself is much harder on me because of my limits and the issues I deal with from the accident. I feel that I've suffered enough embarrassment and will always have the case thrown in my face as a favorite from select members of the lender's bar. There is certainly nothing more I can do about it now. I already buried my clients. By my recollection, I was told there is a time to stop by someone during the hearings. I am hopeful the panel can see fit to handle this in the same manner and let this stop now with some private admonishment as there is no more that I can do.'

*"Recommendations of a Majority of the Hearing Panel*

"157.    Based upon the findings of fact, conclusions of law, and the Standards listed above, a majority of the hearing panel recommends that the respondent be censured and the censure be published in the Kansas Reports.

"158.    Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator."

One panel member dissented from the panel majority's discipline recommendation, arguing instead that Huffman should receive a 90-day suspension.

OBJECTION TO RESPONDENT'S RULE 6.09 LETTER

Just four days before oral argument, Huffman filed a letter of additional authority, citing as authority for this filing Supreme Court Rule 6.09 (2022 Kan. S. Ct. R. at 40). But this rule prohibits submitting additional authority less than 14 days before oral argument. The only exception to the deadline is to address additional authority published or filed less than 14 days before oral argument. This exception does not apply. Also,

Huffman's letter violated Supreme Court Rule 6.09(b), which limits letters of additional authority to 350 words.

The Disciplinary Administrator's office filed an objection to any consideration of this letter of additional authority. We sustain that objection.

RESPONDENT'S POST-HEARING MOTION FOR VIDEO PRESENTATION

After the hearing before this court, Huffman filed a "Motion to Allow Video Presentation of the Case Strategy with the Timeline" apparently to supplement her oral arguments relating to what she describes as "the strategy" of the underlying litigation giving rise to the disciplinary complaint. She suggests this video supplementation should be viewed as a disability accommodation. She also appears to request an order "that time be taken to allow conference between both presenting Counsel as to some facts presented by [the] prosecution." The Disciplinary Administrator's office filed a response asking us to deny the motion, noting the court's appellate practice rules make no provision for supplementation in this fashion and further arguing supplementation is unnecessary. We agree with the Disciplinary Administrator's office.

Huffman's primary opportunity to present details relating to her litigation strategy and its arguable impact on the disciplinary counts against her was before the panel. The record reflects she did that, and we have reviewed the record in its entirety. In addition, at oral arguments before this court, the court was free to explore with both counsel the role the underlying litigation had on the issues presented. Put simply, there is no need for supplementation of the oral arguments. We deny the motion.

DISCUSSION

In a disciplinary proceeding, the court considers the evidence, the panel's findings, and the parties' arguments and determines whether KRPC violations exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Hodge*, 307 Kan. 170, 209, 407 P.3d 613 (2017); Supreme Court Rule 226(a)(1)(A) (2022 Kan. S. Ct. R. at 281). Clear and convincing evidence is evidence that causes the fact-finder to believe that the truth of the facts asserted is highly probable. *In re Murphy*, 312 Kan. 203, 218, 473 P.3d 886 (2020).

A finding is considered admitted if exception is not taken. When exception is taken, the finding is typically not deemed admitted so the court must determine whether it is supported by clear and convincing evidence. *Hodge*, 307 Kan. at 209-10. If so, the finding will not be disturbed. The court does not reweigh conflicting evidence, assess witness credibility, or redetermine questions of fact when undertaking its factual analysis. *In re Hawver*, 300 Kan. 1023, 1038, 339 P.3d 573 (2014).

Huffman was given adequate notice of the formal complaint to which she filed an answer. She was also given adequate notice of the hearing before the panel and the hearing before this court. She appeared at both proceedings. She filed exceptions to the final hearing report. Regarding the portions of the panel report quoted above, Huffman took exception to:

- paragraphs 47-57, 59, 61, 63-65, 67, and 70-82 of the panel's factual findings, which span hearing report paragraphs 46-132;
- paragraphs 135-47 of the panel's legal conclusions, which span hearing report paragraphs 133-47; and

58

- paragraphs 152 and 153 of the panel's analysis of aggravating and mitigating factors, which span hearing report paragraphs 152-56.

Huffman made a general exception to the entire hearing report claiming that "no quotes in testimony from witnesses other than the prosecution appear" and "the lack of defense witnesses and exhibits being considered." Within her exceptions to the panel's analysis of aggravating and mitigating circumstances, she listed several general exceptions stating perceived deficiencies in that analysis. She also took exception to both the panel majority's discipline recommendation and to the dissenting opinion.

The Disciplinary Administrator's office argues Huffman waived any exceptions to paragraphs 88-132 of the panel report because she did not designate those exceptions with specificity. It also argues she failed to brief many exceptions, so they should be considered waived or abandoned. Finally, it notes several facts she argues without supporting record citations and urges us to presume all un-keyed facts lack support. We agree.

Huffman's failure to take exception to paragraphs 88-132 renders those factual statements admitted. A respondent must advance arguments in their brief to support any exceptions, or they are deemed waived or abandoned. *Murphy*, 312 Kan. at 219. The brief must also support the exceptions with appropriate record citations. See *In re Bishop*, 285 Kan. 1097, 1106, 179 P.3d 1096 (2008) ("Here, although Bishop filed a brief, he does not advance his arguments or provide any citation to the record to support his exceptions. We, therefore, deem all exceptions abandoned except for the two he preserved in his brief."). That said, the panel's factual findings appear largely unchallenged in Huffman's opening brief. She seems focused on additional facts she believes the panel ignored in finding KRPC violations.

Keeping Huffman's exceptions in mind, we consider two overarching issues: (1) whether clear and convincing evidence supports the panel's conclusions that she violated KRPC 1.1, 3.1, 3.5, 8.2, and 8.4; and (2) the appropriate discipline.

*Clear and convincing evidence supports some of the panel's conclusions.*

A. *The KRPC 1.1 violation*

KRPC 1.1 requires that "[a] lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." The hearing panel concluded Huffman violated KRPC 1.1 in three ways: (1) she failed to seek settlement of her clients' claims for the terms of the un-consummated 2009 refinancing; (2) she failed to recognize how to resolve the case for her clients' benefit; and (3) she failed to understand relevant legal concepts that in the panel's view collectively demonstrated her "lack of competence as a litigator" resulting in multiple deficiencies in her pleadings.

As to the first and second items, Huffman argues the panel disregarded her witness Larry Rute's testimony establishing "settlement is something [she] engages in," and the fact Wells Fargo never offered to settle on the terms the panel believed she should have sought. The Disciplinary Administrator's office counters that this testimony is irrelevant, noting Rute was unfamiliar with the litigation at issue. It also contends the arguments about Wells Fargo's failure are abandoned because they are not supported by authority or irrelevant because the burden always remained on Huffman to try to achieve her clients' goals. We agree with this characterization of Rute's testimony.

During his direct examination, Rute agreed with Huffman that he recalled her "attending a mediation with [him] and settling cases . . . ." He also said she understood concepts of best and worst-case scenarios and "bracketing" as they pertain to monetary

60

settlement negotiations. But on cross-examination he admitted he had not read the complaint in this case and did not have any knowledge about the underlying mortgage litigation.

Nevertheless, a majority of the court holds the facts do not support a conclusion that Huffman violated KRPC 1.1 by not pursuing settlement on the 2009 refinancing terms or by otherwise failing to resolve the case for her clients' benefit. The panel's factual findings reflect Huffman offered to settle for $750,000 plus a release of R.B. and S.B.'s mortgage, based on her valuation of the KCPA and tort claims she pled in her petition. And Huffman argues her clients consented to an aggressive posture during settlement, and there is no testimony from them to the contrary.

In the legal malpractice context, it has been recognized that "the necessity for an attorney's use of ordinary skill and knowledge extends to the conduct of settlement negotiations." *Rizzo v. Haines*, 520 Pa. 484, 499, 555 A.2d 58 (1989). "Attorneys are supposed to know the likelihood of success for the types of cases they handle and they are supposed to know the range of possible awards in those cases." *Ziegelheim v. Apollo*, 128 N.J. 250, 263, 607 A.2d 1298 (1992). But settlement negotiations are difficult to orchestrate to a mutually acceptable result, particularly within the constraints of the clients' willingness to compromise. The majority here concludes the facts fail to show by clear and convincing evidence that Huffman did not employ the requisite skill and knowledge in failing to resolve the mortgage litigation under the circumstances. A minority of the court would have found a violation.

Moving to the panel's conclusion that the specific deficiencies it identified demonstrated Huffman's incompetence as a litigator, we hold they are supported by clear and convincing evidence. She argues the panel ignored evidence that she still had discovery requests pending when summary judgment was granted in the first federal

61

lawsuit. And Issue I of her brief argues the panel erred by disregarding evidence of her attendance at a "Max Gardner Boot Camp" and use of discovery materials from that training, and her consultation with the Kansas Attorney General's Office on consumer protection issues.

In addition, in Issue III of her brief, she argues that "EMERGING AREA SPECIFIC CASE LAW . . . DEVELOPMENTS THAT SUPPORT" her positions. And she notes the panel did not discuss her assertion that the foreclosure would not have occurred under new federal protections for homeowners enacted in 2014 or "discussed . . . what arguments [she] missed that could have saved [her clients'] home." She contends she unfortunately—but not unethically—lost on her theories concerning the "Torrens Land System of caveats" not being recognized by Kansas law and her theory that the KCPA applied to financial communications. She views discipline as "unjust" under these circumstances and claims she had no professional guidance about how to handle them because she was the "first one[] through [the] wall" on the issues she raised.

But these arguments are irrelevant as to whether the activity the panel cited violated Rule 1.1 because it found her methods to be improper. And "[c]ompetent handling of a particular matter includes . . . use of methods and procedures meeting the standards of competent practitioners." KRPC 1.1, Comment 5 (2022 Kan. S. Ct. R. at 328); see, e.g., *In re Dennis*, 286 Kan. 708, 727, 188 P.3d 1 (2008) ("The repeated failure to timely respond to discovery requests, court orders, and dispositive motions is clear evidence of incompetence."); *In re Romious*, 291 Kan. 300, 308, 312, 240 P.3d 945 (2010) (KRPC 1.1 violated when attorney filed motion seeking judge's recusal that lacked factual allegations).

The panel's facts show Huffman did not competently handle the litigation. She consistently filed late pleadings; failed to follow rules governing the pleadings

amendment; failed to follow rules governing the form and content of appellate briefs; failed to abide by court admonishments to stop raising issues already resolved; failed to supply documents requested by the court; filed clearly meritless claims; did not understand the legal concept of res judicata; and made arguments to the Tenth Circuit Court of Appeals that were "woefully inadequate," were "meritless," "made no sense and [were] hard to follow," and were "unsupported by the record." And even if her underlying claims had merit, this conduct still violated KRPC 1.1.

### B. The KRPC 3.1 violation

KRPC 3.1 provides,

"A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law. A lawyer for the defendant in a criminal proceeding, or the respondent in a proceeding that could result in incarceration, may nevertheless so defend the proceeding as to require that every element of the case be established."

The panel referenced several reasons why it concluded Huffman violated KRPC 3.1. Those were: she launched a new Shawnee County lawsuit based on the same facts as the case then pending on appeal in 10-CV-4141, which was ultimately removed to federal court and dismissed as res judicata; she filed responsive pleadings and amended responsive pleadings in Wells Fargo's Shawnee County foreclosure action after the court dismissed the case; and she repeatedly sought reconsideration of previously decided matters throughout the litigation despite the court's admonishments to stop. Substantial competent evidence supports these facts.

Huffman argues mainly that she had a good-faith belief in her claims' merits. She contends there was nothing harassing about defending a constitutionally protected homestead; that her position—apparently about robo-signing—tracked the positions of "49 Attorney Generals"; and that whether a position is meritorious should not be a "win or lose" determination. She also argues the panel ignored changes in the legal landscape during the litigation. And she broadly challenges the panel's citation to Kansas Supreme Court Rule 202 (2019 Kan. S. Ct. R. 239), repealed January 1, 2021, and replaced in part by Kansas Supreme Court Rule 220 (2022 Kan. S. Ct. R. at 275). But she does not support her Rule 202 reference with pertinent authority.

Again, Huffman's focus in all these arguments is misplaced.

"The advocate has a duty to use legal procedure for the fullest benefit of the client's cause, but also a duty not to abuse legal procedure. The law, both procedural and substantive, establishes the limits within which an advocate may proceed. However, the law is not always clear and never is static. Accordingly, in determining the proper scope of advocacy, account must be taken of the law's ambiguities and potential for change." KRPC 3.1, Comment 1 (2022 Kan. S. Ct. R. at 390).

Huffman's arguments concentrate on what she views as shifting legal grounds underpinning her claims, but she does not address the crux of the panel's misconduct conclusion that her conduct was outside relevant procedural and substantive limits. For example, the panel concluded she violated KRPC 3.1 by filing a new Shawnee County lawsuit while the federal appeal was pending in the first case, which arose out of the same facts and largely raising the same claims. Huffman alludes to receiving "permission" from Shawnee County District Judge Franklin Theis to file this second suit but does not address the overriding problem that it was meritless because those claims were barred by res judicata. See *Dennis*, 286 Kan. at 732-33 (holding violation of KRPC

64

3.1 established by clear and convincing evidence when rational fact-finder could conclude it was highly probable attorney filed a frivolous lawsuit).

And Huffman's focus on consumer protection issues and lender protection provides no cover for her decision to assert several other claims, for example, that MERS "converted" R.B. and S.B.'s "chain of title." Indeed, her frivolous motions alone supply an adequate basis for a KRPC 3.1 violation, even without considering the relative merits of the claims advanced in the underlying litigation. See *In re Blume*, 309 Kan. 1313, 1322, 1334, 443 P.3d 305 (2019) (holding attorney violated KRPC 3.1 by filing a "frivolous motion to set aside" a judgment that "'contained "a tangled web of some irrelevant ramblings and vagaries"'").

We hold clear and convincing evidence supports the panel's conclusion that Huffman violated KRPC 3.1.

### C. The KRPC 3.5(d) and 8.2(a) violations

Huffman next argues KRPC 3.5(d) is unconstitutionally vague and suggests its application, along with KRPC 8.2(a), infringes on her rights to free speech under the First Amendment to the United States Constitution and section 11 of the Kansas Constitution Bill of Rights. She also contends the evidence failed to prove she violated KRPC 3.5 and KRPC 8.2 because it did not establish her comments about Judge Marten were knowingly or recklessly false.

The vagueness challenge is easily disposed of. Our precedent is clear that a respondent in a disciplinary action must either raise an issue before the panel or explain why it is properly before the court if raised for the first time on appeal.

"[Kansas Supreme Court] Rule 6.02 sets out the requirements for filing an appellant's brief. In subparagraph (a)(5), it requires that '[i]f the issue was not raised below, there must be an explanation why the issue is properly before the court.' Although this rule applies to an 'appellant,' it is incorporated into disciplinary proceedings in this court through Kansas Supreme Court Rule 212 if a respondent has filed exceptions.

"Rule 212(e)(3) (2018 Kan. S. Ct. R. 257) requires a disciplinary respondent to file a brief, sets forth the timeframe for doing so, and states: 'The briefs shall be of such number *and form* and be served in such manner as is provided by the rules relating to appeals in civil actions.' (Emphasis added.) Rule 6.02 specifies the form for Crandall's brief, and it required him to explain why the constitutional issue was properly before the court even though he had not raised it before the hearing panel. . . .

"Our caselaw makes clear that respondents in disciplinary cases must comply with Rule 6.02. We could cite a long line of cases in which this court has enforced Rule 6.02 when disciplinary respondents have filed briefs that do not comply with its requirements but note only a few to illustrate. See, e.g., *Hawver*, 300 Kan. at 1048 ('document attached to Hawver's brief is not properly before this court because it is not part of the record' as required by Rule 6.02[b]'); *Dennis*, 286 Kan. at 723 (faulting respondent's brief because it contained neither a statement of facts nor specific citations to the record on appeal as required by Rule 6.02[d] [2007 Kan. Ct. R. Annot. 37])." *In re Crandall*, 308 Kan. 1526, 1541-42, 430 P.3d 902 (2018).

In *Crandall*, the court held the respondent in an attorney discipline proceeding abandoned his First and Fourteenth Amendment challenges to KRPC 8.5 (2018 Kan. S. Ct. R. 382) and Kansas Supreme Court Rule 201 (2018 Kan. S. Ct. R. 233) when he failed to make the arguments before the panel and failed "to comply with Rule 6.02(a)(5)'s requirement that he explain why [the court] should consider his constitutional arguments when they are raised for the first time in his brief in this court." 308 Kan. at 1542.

Huffman's response brief does not challenge the Disciplinary Administrator's representation that she failed to raise the constitutional question before the panel. And her opening brief does not contain any explanation why the court should still consider the constitutional argument raised for the first time. Her response brief contains an explanation, but only by arguing she should not have to comply with the requirement. Neither brief cites or discusses Rule 6.02 (2022 Kan. S. Ct. R. at 35) or relevant caselaw.

As to the merits of the rule violations, under KRPC 3.5(d) (2022 Kan. S. Ct. R. at 396), "[a] lawyer shall not . . . engage in undignified or discourteous conduct degrading to a tribunal." And under KRPC 8.2(a) (2022 Kan. S. Ct. R. at 432), "[a] lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge . . . ."

The panel concluded Huffman violated both rules when she recklessly made several false statements about Judge Marten in two motions asking him to reconsider his rulings. These statements included implying he had discriminated against her clients based on race or socioeconomic status, implying he decided based on power rather than truth, and accusing him of treating her differently than opposing counsel. Huffman argues there is no evidence the statements were knowingly or recklessly false.

During Huffman's direct testimony, the panel's chairperson asked her to address the comments about Judge Marten. She testified that she did not "make any excuse" for them, that she "wrote what I wrote," and that she did not "intend it the way it came across." During cross-examination, the Disciplinary Administrator asked her whether she had "any basis" for writing that Judge Marten's "commentary punctuates the socioeconomic disconnect of the Court with these clients and generally the middle class public, particularly of color, who cannot afford the fights and discovery obstructions of

67

the banks," "other than your clients were African American and didn't win." Her response illustrates she had no basis for asserting this:

"I—this didn't mean to be like a race statement. This, from my perspective, has been misunderstood. This is more political speech. And the KCPA issue is political. I mean, I've been involved in a hearing between the House Judiciary. We changed the law to address some of the things that came out in *In Re—In Re Larkin*. But access to the Court and this comment about urgings on from, you know, counsel, I think does punctuate the fact that we do not have a system that gives equal advantage that, you know, we have this shortage. We have the middle class who can't afford these kind of fights when you're dealing with these type of big banks. And I think that those things are even more important to minorities.

"If I—you know, I thought about how it sounds like people are interpreting this, but I didn't play the race card. I didn't play the race card from my perspective on purpose, because I don't—well, I mean. Wells Fargo got hit with NAACP, they have their issues, but this was about—they would have filed that caveat whether my clients were white or black. I mean, but people don't have access to this. People can't afford these discovery wars."

Later in cross-examination, she disavowed any belief Judge Marten was biased against R.B. and S.B. She testified:

"I—I think Judge Marten took the word of Wells Fargo, and I think the wool was pulled over his eyes. I do not believe that he would do anything that he didn't believe was true. And I think that goes back to the discovery and my urgings to tell the Court the truth. I do not think that Judge Marten harbored independent feelings against my client. And I do think that he was very frustrated by the idea that, you know, the case, 'um, was back. And I know in my heart that it would have been different if it had been in state court. I know what my venue was, I know what I was winning in front of that judge."

Taken together, her testimony demonstrates a serious lack of judgment in making these comments and statements. But we are also cognizant that judges and courts are not above criticism—even harsh criticism—by lawyers vigorously advocating sometimes unpopular causes on behalf of marginalized people. And balancing this against the equally important need for a decorous and orderly courtroom is an inexact endeavor at best. Given this, a majority of the court holds Huffman's statements do not rise to the heightened standard necessary to support the panel's conclusion that she violated KRPC 3.5(d) and KRPC 8.2(a). In reaching that decision the majority considered and weighed as significant the fact Judge Marten himself did not take affront to Huffman's comments or invoke contempt at the time. A minority of the court would have found violations of these two rules.

### D. The KRPC 8.4(d) violation

KRPC 8.4(d) (2022 Kan. S. Ct. R. at 434) provides, "It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice." The panel found Huffman violated this rule by repeatedly relitigating previously decided issues and making false statements impugning Judge Marten's integrity.

Conduct requiring a court to unnecessarily consider frivolous issues obviously delays the proceedings and causes the lawyers' clients to incur unnecessary legal fees and other expenses. Such conduct can support finding that the lawyer violated KRPC 8.4(d). See *In re Shepherd*, 310 Kan. 739, 746, 752, 448 P.3d 1049 (2019) (failure to file brief on behalf of client, resulting in "'unnecessary consideration by the court, the dismissal of the appeal, and delay with the appellate process'" deemed clear and convincing evidence that attorney violated KRPC 8.4[d]); *In re Gordon*, 258 Kan. 784, 791, 793, 908 P.2d 169 (1995) (concluding violation of 8.4[d] supported by clear and convincing evidence when attorney failed to timely respond to discovery request resulting in sanctions and

mishandled bankruptcy case resulting in unnecessary legal fees and other expenses to clients); *Blume*, 309 Kan. at 1323 (concluding clear and convincing evidence supported conclusion respondent violated 8.4[d] by filing a frivolous motion to alter or amend judgment); *In re Grillot*, 309 Kan. 253, 259, 263, 433 P.3d 671 (2019) (concluding the respondent engaged in conduct prejudicial to the administration of justice when he filed incomplete, inaccurate, and false accountings in a probate case).

Here, the conduct cited by the panel reflects Huffman wasted judicial resources by pursuing multiple frivolous motions and a frivolous lawsuit barred by res judicata. And she filed pleadings impugning Judge Marten's integrity. That conduct also resulted in her clients being ordered to pay attorney fees exceeding the mortgage loan principal, along with the clients' home being foreclosed.

Huffman challenges KRPC 8.4's constitutionality by incorporating her arguments against KRPC 3.5 and 8.2, discussed above. She asserts the KRPC 8.4 violation is founded on the same conduct forming the violations of those two rules, but does not argue what effect, if any, this assessment should have. She then argues: "The administration of justice was over, no false evidence was provided by Respondent." She suggests her conduct could not have prejudiced the administration of justice because "Wells [Fargo] continued to move forward." She also argues there was no pattern of misconduct because the litigation went on for years. And under headings styled "CHILLING ADVOCACY & INTEGRITY," "RESPONSIBILITY FOR THE WRITING WAS ACKNOWLEDGED," and "COUNSEL'S ETHICAL CONSTRUCT IN PRACTICE," she argues she has good character, and that she both acknowledged responsibility for the writings containing the comments about Judge Marten and apologized to him.

We hold the KRPC 8.4(d) violation is established by clear and convincing evidence. The panel's findings demonstrate Huffman serially relitigated claims that were either frivolous at their outset or made frivolous by prior decisions resolving them against her clients. The panel's findings also demonstrate her statements about Judge Marten tended to impugn his integrity, and by extension, that of the courts. Huffman's arguments about chilling advocacy, like many of her other arguments, incorrectly assume her conduct violated the rules only because she did not win. And her constitutional challenge to the rule as it applies to her commentary about Judge Marten is waived, as discussed above. Moreover, her apology and accepting responsibility for the comments does not negate the fact she made them.

APPROPRIATE DISCIPLINE

The question remaining is the appropriate discipline. The Disciplinary Administrator's office, panel majority, and dissenting panel member disagree about the recommended discipline. The panel majority recommended a public censure, and the dissenting panel member recommended a 90-day suspension. Although Huffman did not raise the discipline to be imposed as a separate issue in her brief, she argues in its closing paragraph, "[T]his Court should reject the panel's report and handle anything else necessary in private." The Disciplinary Administrator continues, as it did before the panel, to recommend indefinite suspension.

> "In any given case, this court is not bound by the recommendations from the hearing panel or the Disciplinary Administrator. 'Each disciplinary sanction is based on the specific facts and circumstances of the violations and the aggravating and mitigating circumstances presented in the case.' 'Because each case is unique, past sanctions provide little guidance.' [Citations omitted.]" *Hodge*, 307 Kan. at 230.

71

The court generally looks to the American Bar Association Standards for Imposing Lawyer Sanctions to aid in determining discipline. That framework considers "four factors in determining punishment:  (1) the ethical duty violated by the lawyer; (2) the lawyer's mental state; (3) the actual or potential injury resulting from the lawyer's misconduct; and (4) the existence of aggravating or mitigating factors." 307 Kan. at 231.

Here, the panel found Huffman knowingly violated ethical duties owed to her clients, to the public, and to the legal profession. Her inadequate representation resulted in judgment against R.B. and S.B. for nearly $290,000 in Wells Fargo's legal fees. This amount was "larger than the expected value of the underlying mortgage interest." And it was amassed due to Huffman's "extensive and needless" discovery requests and other improper tactics which "caused the . . . action to metastasize beyond any reason." These tactics included "seeking court review of the same issues over and over again resulting in the waste of judicial time and resources."

The panel also found several aggravating and mitigating factors. For aggravating factors, it concluded Huffman engaged in a pattern of misconduct throughout the R.B. and S.B. litigation and, in doing so, committed multiple offenses. In addition, the panel found R.B. and S.B. were vulnerable to Huffman's misconduct, noting they relied on Huffman and believed they had sued Wells Fargo when they had not, that Huffman drove the litigation approach, and that R.B. and S.B. were ultimately "ordered to pay nearly $300,000 in attorneys fees and expenses."

Equally troubling, the panel found Huffman "refused to acknowledge the wrongful nature of her conduct," arguing before the panel that she did not violate any rules. The hearing panel was

"concerned, that at this late date, the respondent just does not seem to 'get it.' She is either unwilling or unable to acknowledge that what she did [in] this case—repeatedly filing lawsuits when the issues had already been resolved and by making false and disparaging statements about a judge—violates the Kansas Rules of Professional Conduct."

This perspective carried through to Huffman's briefings to this court. Her arguments, particularly concerning the Rule 1.1 and 3.1 violations, indicate she is under the misapprehension that discipline is being imposed simply because she was not successful in the litigation. And in arguing "[p]unishment is not warranted in this matter," Huffman contends her conduct was beneficial to the public at large, by stating: "The public has been helped by moving the law towards consumer protection and even advancing changes with the legislature to achieve more consistent results with the Courts."

For mitigating factors, the panel found Huffman lacked a prior disciplinary record; a serious car accident resulting in a traumatic brain injury and depression contributed to the misconduct; she was inexperienced in the practice of law when the misconduct occurred; she presented evidence in support of her good character from several witnesses; and she had already paid $5,000 in federal court sanctions for some of the misconduct at issue.

Clear and convincing evidence supports the findings of violations of the professional rules of conduct as we note above. Huffman's multiple violations, pattern of misconduct, and injury to her clients are plainly demonstrated by the pleadings and orders filed in the underlying cases. The mitigating factors are likewise supported by the panel's cited evidence.

In making its discipline recommendation, the panel quoted the pertinent sections of the ABA Standards for Imposing Lawyer Sanctions for each of these types of

misconduct. See ABA Standards 4.5 (lack of competence); 5.1 (failure to maintain personal integrity); 6.1 (false statements, fraud, and misrepresentation); 6.2 (abuse of the legal process); 7.0 (violations of duties owed as a professional).

But one ABA Standards provision the panel did not cite was from Standard 4.51, discussing when disbarment is appropriate when attorney shows lack of competence:

"4.51 Disbarment is generally appropriate when a lawyer's course of conduct demonstrates that the lawyer does not understand the most fundamental legal doctrines or procedures, and the lawyer's conduct causes injury or potential injury to a client."

And for misconduct involving abuse of legal process, the ABA standards provide,

"Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving failure to expedite litigation or bring a meritorious claim, or failure to obey any obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists." ABA Standards 6.2.

With regard to this, ABA Standards note:  "Suspension is generally appropriate when a lawyer knows that he or she is violating a court order or rule, and causes injury or potential injury to a client or a party, or causes interference or potential interference with a legal proceeding." ABA Standard 6.22.

In addition, the court itself observes, as the Disciplinary Administrator did, that Huffman's brief here demonstrates continued professional failings. As the Disciplinary Administrator commented:

"Respondent's brief to this Court demonstrates she still lacks the competence required for appellate litigation—a factor this Court may consider in determining whether

74

to impose discipline that provides more protection of the public and legal system than published censure. *Cf., In re Anderson*, 247 Kan. 208, 213, 795 P.2d 64 (1990) (in sanctions section of the opinion, the Court noted respondent's exceptions, brief, and oral argument did not comply with appellate rules). Respondent's brief fails to comply with virtually every rule of appellate briefing. It lacks coherent structure and is largely incomprehensible. Additionally, much of the brief is devoted to irrelevant arguments about the caveat, whether Wells Fargo owned the note, and the legal issue of whether the KCPA applied to financial communication, which demonstrates Respondent is still unable to identify and make pertinent legal arguments."

A majority of the court concludes suspension with a two-year term is the appropriate discipline. In arriving at this, the majority has considered the aggravating and mitigating circumstances described above, as well as the clear and convincing evidence supporting the panel's findings and conclusions. That said, the majority is amenable to staying the suspension after the first 90 days so long as Huffman adheres to a practice supervision plan approved by the Disciplinary Administrator's office that extends for the remaining suspension period. If Huffman and the Disciplinary Administrator's office cannot agree on an appropriate plan of supervision either may file a motion with this court to resolve the dispute about this or compliance with the plan. The majority further holds that after successfully completing probation, or at the end of the suspension term, a reinstatement hearing will be necessary to ensure Huffman is capable of practicing law without further supervision. A minority of the court would have imposed a harsher discipline.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Donna L. Huffman be and she is hereby suspended from the practice of law in the state of Kansas in accordance with Supreme

Court Rule 225(a)(3) (2022 Kan. S. Ct. R. at 281) for two years as of the date of this opinion.

IT IS FURTHER ORDERED that the above suspension will be stayed after the first 90 days provided respondent enters into a practice supervision plan approved by the Disciplinary Administrator's office that extends for the remaining suspension period. Approval of a probation plan by that office is required before any stay can commence. Any dispute between respondent and the Disciplinary Administrator's office over the practice supervision plan or compliance with it will be resolved by this court.

IT IS FURTHER ORDERED that the respondent shall comply with Supreme Court Rule 231 (2022 Kan. S. Ct. R. at 292) (notice to clients, opposing counsel, and courts of record following suspension).

IT IS FURTHER ORDERED that respondent comply with Supreme Court Rule 232 (2022 Kan. S. Ct. R. at 293), including undergoing a reinstatement hearing after the two-year suspension term ends. Additional conditions for reinstatement may be explored by the Disciplinary Administrator's office, a reinstatement panel, or the court during any reinstatement process.

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to respondent and that this opinion be published in the official Kansas Reports.